John DOE, Petitioner,

v.

DISTRICT OF COLUMBIA COMMIS-
SION ON HUMAN RIGHTS,
Respondent,

Howard University Hospital, Intervenor.

No. 91–AA–997.

District of Columbia Court of Appeals.

Argued Oct. 26, 1992.
Decided Jan. 29, 1993.

P. Daniel Bruner, with whom Peter J. Hopkins and Russell F. Smith, III, Washington, DC, were on the brief, for petitioner.

Harold E. Jordan, with whom Rachel C. Evans, Washington, DC, was on the brief, for intervenor.

Charles L. Reischel, Deputy Corp. Counsel, with whom John Payton, Corp. Counsel, and Edward E. Schwab, Asst. Corp.

Counsel, Washington, DC, filed a statement in lieu of brief, for respondent.

Before FERREN, SCHWELB, and KING, Associate Judges.

KING, Associate Judge:

Petitioner seeks reversal of an order of the District of Columbia Commission on Human Rights ("the Commission") denying him damages on his claim that he was subject to various acts of discrimination, because of his sexual orientation, while he was patient at Howard University Hospital ("the Hospital"). He contends the Commission erred when it concluded that one of his claims was barred by the statute of limitations; concluded that the Hospital did not discriminate on the basis of his sexual orientation; and denied him damages for acts of discrimination which the Commission found had been committed. We reverse the Commission's ruling with respect to the statute of limitations and remand for consideration of damages on the affected claim. We also remand for a reconsideration of the denial of damages for acts of discrimination the Commission did find. In all other respects we affirm.

## I. Facts

On November 14, 1987, following an argument with his boyfriend, petitioner ingested approximately 200 aspirin tablets, intending to commit suicide. Later that evening, when he was discovered semi-conscious on the floor by some of his friends, petitioner was transported by ambulance to the Hospital.

Upon admission to the Hospital, petitioner was treated in the emergency room. After receiving emergency care, he was transferred to the medical intensive care unit where he was treated by Dr. Randall and Dr. Thompson. His transfer occurred on November 14, the day of his suicide

attempt. Noted in appellant's medical history, *inter alia*, and relevant to this appeal, were the following: hepatitis, gonorrhea and syphilis, homosexual history, depression, "guaiac" positive stools, previous suicidal gestures, history of psychological counseling since childhood, and a negative HIV antibody test result two years prior to his hospital admission. Dr. Randall ordered that appellant be placed on blood and body fluid precautions, which required that attending care-givers be gowned, gloved, and masked, and that petitioner's blood and body fluids be sequestered in some fashion. On November 15, 1987, Dr. Randall ordered an HIV test for petitioner.[1] The Commission found that the analysis of petitioner's blood occurred some time after November 21, 1987.

At the time of petitioner's hospital stay, Hospital policy directed that all patients diagnosed as potentially suicidal be transferred to the closed psychiatric unit, unless contraindicated due to the patient's medical condition. Another Hospital policy, however, called for the exclusion of patients with infectious diseases from the unit. Because of that policy, the Hospital would not permit petitioner's transfer to that psychiatric unit unless, and until, his HIV test results came back negative.

On November 16, petitioner was transferred to a private room in the medical ward of the Hospital. While there, he remained on blood and body fluid precautions, and received treatment for the physical symptoms resulting from his salicylate poisoning. Petitioner was never transferred to the psychiatric unit because the results of his HIV test were not available before he was discharged. According to the Commission's findings, petitioner's psychiatric care consisted mainly of interaction with "psych techs," hospital workers who were required to have high school diplo-

---

1. The Hospital argued, both before the hearing examiner and in its Exceptions to the Examiner's Notice of Proposed Decision and Order, that the HIV test was ordered because it was requested by the petitioner. The Commission, affirming the examiner's decision, found that the test was not requested by petitioner, and that it was ordered for a discriminatory purpose, *i.e.*, be-

cause of petitioner's sexual orientation. The Hospital does not challenge that finding in this court. Thus, we must accept the Commission's finding that the HIV test was ordered by the Hospital for a reason that violates the Human Rights Act, *i.e.*, because of petitioner's sexual orientation.

mas, but were not required to have any training in psychotherapy or psychology.

On November 20, petitioner's medical notes revealed that petitioner was "strongly preoccupied with his discharge," and that he wanted to return to work on the following Monday. The notes also recorded that petitioner felt that he had "been manipulated and lied [sic]." On November 21, petitioner was discharged against the advice of his doctors, and an entry in the medical notes stated: "the pt [patient] is anxiously awaiting discharge—states he wants to get back to his job." At the time of his discharge, petitioner had not received any information on the results of his HIV antibody test.[2]

Petitioner filed a complaint with the Office of Human Rights ("OHR") on November 21, 1988—one year, to the day, after his discharge. On April 17, 1990, after an investigation, OHR determined that there was probable cause to believe the Hospital discriminated against appellant on the basis of his sexual orientation and his perceived handicap, *i.e.*, that he was an HIV carrier.

The parties presented their cases in a five-day evidentiary hearing, held before a hearing examiner, from February 25, 1991 through March 1, 1991. On June 14, 1991, the hearing examiner filed a Notice of Proposed Decision and Order, which set forth the following findings and conclusions: 1) petitioner's claim that the Hospital subjected him to an HIV test against his will was meritorious, but was time-barred; 2) the causes of action based on the implementation of blood and body fluid precautions and the denial of psychiatric services were not time-barred; 3) the Hospital, acting through its care providers, perceived petitioner to be HIV-infected; 4) perception as HIV-infected or HIV sero positive is a perceived physical handicap for purposes of the Human Rights Act ("HRA"); 5) the Hospital subjected petitioner to an HIV test, without his consent, because of his homosexuality; 6) the decision to place petitioner on blood and body fluid precautions

was medically warranted and not in violation of the HRA; 7) the Hospital, a place of public accommodation under the HRA, directly and indirectly denied petitioner its advantages and accommodations as they pertained to post-suicide patients in need of psychiatric-related care; 8) the denial of such advantages and accommodations was for a discriminatory reason, namely, because of petitioner's perceived physical handicap; 9) petitioner failed to introduce competent medical evidence to demonstrate that he incurred expenses or suffered compensable damages as a result of the Hospital's violation of the HRA; and 10) the evidence did not warrant an award of punitive damages.

After the parties had filed exceptions to the proposed decision, on August 12, 1991, the Commission filed its Notice of Final Decision and Order, which incorporated all of the findings and conclusions set out in the proposed order as noted above. The Commission also concluded that blood and body fluid precautions were not ordered, and services and facilities were not denied to petitioner, because of his sexual orientation.

On appeal, petitioner challenges the Commission's rulings that: 1) his claim for discriminatory HIV testing was time-barred; 2) the implementation of blood and body fluid precautions was not discrimination based on his sexual orientation; 3) the denial of psychiatric services was not discrimination based on his sexual orientation; and 4) compensatory damages were not warranted. The Hospital does not challenge any of the Commission's rulings. We affirm in part, reverse in part, and remand for further proceedings.

## II. The HIV Test

■ The District of Columbia Administrative Procedure Act requires that an agency's findings be supported by reliable, probative and substantial evidence, and that its legal conclusions flow rationally from the agency's findings. D.C.Code § 1–1509(e) (1992 Repl.); *American University*

---

**2.** Petitioner's test result ultimately turned out to be positive. Petitioner was not informed of the result, however, until he filed his complaint with the Office of Human Rights. At that time, an investigator discovered the result and informed petitioner.

*v. Commission on Human Rights,* 598 A.2d 416, 420 (D.C.1991); *Eilers v. Bureau of Motor Vehicles Services,* 583 A.2d 677, 683 (D.C.1990).

In its Final Order, the Commission held that, although the HIV test was given *without petitioner's informed consent and for a discriminatory purpose, i.e.,* because of his sexual orientation, the claim was time-barred.[3] The Commission based its holding on its understanding that the discriminatory conduct occurred on November 15, when the test was ordered and the blood was drawn. We conclude that the Commission's ruling on this issue was erroneous.

■ The limitation period for an action brought pursuant to the District of Columbia Human Rights Act is one year. That period begins to run at the time "of the occurrence of the unlawful discriminatory practice, or the discovery thereof." D.C.Code § 1–2544(a); *see also Jones v. Howard University,* 574 A.2d 1343, 1345 (D.C.1990). Because petitioner did not file his claim with OHR until November 21, 1988, petitioner's claim is barred by the one-year statute of limitation *if* the discriminatory action is deemed to have occurred on November 21, 1987, or some earlier date. We hold that petitioner's cause of action is not time-barred, because it did not accrue until the HIV analysis was actually performed on his blood sample—some time after November 21, the date of his discharge, and therefore within the one year statute of limitation.

■ Generally, a statute of limitation begins to run at the time the right to maintain the action accrues, *i.e.,* from the time that all the elements of a cause of action have come into existence. *DeKine v. District of Columbia,* 422 A.2d 981, 988

n. 14 (D.C.1980) (citing *S. Freedman & Sons, Inc. v. Hartford Fire Insurance Company,* 396 A.2d 195, 198 (D.C.1978)). On November 15, when the test was ordered by the attending doctor and petitioner's blood was drawn, petitioner had no right to maintain this action. At that point, petitioner had simply been informed by the Hospital that, some time in the future, his blood would be tested for the presence of the HIV antibodies. The act which the Hospital threatened was the alleged discriminatory act; however, no legal discrimination could occur until the blood was actually tested. For example, if, after petitioner's blood sample had been taken, the Hospital countermanded the plan to test his blood, petitioner would not have suffered any injury.[4] The taking of petitioner's blood, and the ordering of the HIV test, involve different concerns from the actual testing of his blood. *See Government of Virgin Islands v. Roberts,* 756 F.Supp. 898, 901–02 (D.V.I.1991) (compelled HIV testing involves two "intrusions": the first intrusion is minor, and is occasioned by the procedure itself, while the second intrusion—the analysis of one's blood—gives rise "to a graver concern," since that analysis " 'can reveal a host of private medical facts' about the individual being tested") (citing *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989)). We are aware of no authority for the proposition that the mere threat to discriminate is equivalent to an actual act of discrimination, and the Hospital has cited no case so holding. Therefore, we conclude that petitioner's cause of action accrued on the date the HIV antibody test was conducted on his blood sample, and no earlier.[5] Thus, the Commission erred when

---

3. The Commission also found that petitioner was not subjected to the HIV test because the Hospital perceived him to be HIV antibody positive. Petitioner does not challenge that finding.

4. We need not decide whether the act of drawing blood for some improper purpose, standing alone, is itself actionable, since in this case any action based on drawing blood would be time barred.

5. We reject petitioner's alternative theory that the testing process was a "continuing violation" extending until his blood was actually tested. A continuing violation exists where there is a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period. *Milton v. Weinberger,* 207 U.S.App.D.C. 145, 150, 645 F.2d 1070, 1075 (1981) (citing SCHLEI & GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 232 (Supp.1979)).

it concluded that petitioner's claim was time-barred.

### III. Blood and Body Fluid Precautions

■ Petitioner also contends that the Commission erred in ruling that blood and body fluid precautions were not ordered for a discriminatory purpose. He alleges that the decision to place him on these precautions was based, at least in part, on his sexual orientation. Petitioner bases his contention on the section of the HRA which states:

> It shall be an unlawful discriminatory practice to do any of the following acts, *wholly or partially* for a discriminatory reason based on the ... sexual orientation ... of any individual:
>
> (1) To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation.

D.C.Code § 1–2519(a) (1992 Repl.) (emphasis added). We hold that the Commission could reasonably conclude that the Hospital considered petitioner's sexual orientation merely as a medical risk factor, not as a discriminatory basis for the actions taken with respect to him, and that the decision to order blood and body fluid precautions was based upon petitioner's medical history.

At the hearing before the examiner, there was substantial evidence presented regarding the propriety of implementing blood and body fluid precautions. Dr. Randall, the physician who ordered the precautions, testified that he implemented them based upon petitioner's medical history, which included the information that petitioner had a history of sexually transmitted diseases and had suffered from hepati-

tis. Dr. Randall explained that petitioner's history of homosexuality placed him in a "high risk group," and that the sexually transmitted diseases evidenced that, at some point, petitioner had engaged in unprotected sex.

In addition, Dr. Wayne Greaves and Dr. David Henderson, experts in the field of epidemiology, both testified that, based upon petitioner's medical history, the precautions were warranted under the circumstances. Both experts opined that there is a correlation between sexually transmitted diseases and hepatitis on one hand, and a patient being "HIV positive" on the other. Additionally, Dr. Henderson testified that if one suspects a blood-borne infectious disease, it is proper procedure to implement blood and body fluid precautions until the risk of that disease has been excluded in the patient. Dr. Henderson also testified that the Center for Disease Control ("CDC") recommended that precautions be used when dealing with patients who are suspected carriers of AIDS or HIV. Finally, the CDC Guidelines, in effect at the time, instructed that it was safer to over-isolate than to under-isolate, and that isolation precautions should be implemented immediately for patients who appear to have an infectious disease, rather than waiting for test results.[6]

On the other hand, petitioner's expert testified that the information available to the Hospital staff, *i.e.*, that petitioner had a history of hepatitis, gonorrhea, syphilis and a previous negative HIV test, was insufficient to provide a reasonable basis for suspecting that he was infectious for either hepatitis or HIV. The expert opined that further inquiry was required, such as questioning whether petitioner had recently engaged in unsafe sexual practices, and de-

---

To be considered continuing in nature, however, the discrimination may not be limited to isolated incidents, but must pervade a series or pattern of events which continue into the filing period. *Id.* 645 F.2d at 1076. Petitioner has shown neither a series of related acts, nor a pattern of discrimination by the Hospital. *See also Jones v. Howard University, supra,* 574 A.2d at 1346 (complainant failed to allege any separate acts of discrimination committed by the

Hospital, and therefore no continuing violation was found).

6. Since 1987, although not yet implemented at the Hospital when petitioner was a patient, CDC has recommended "universal precautions," i.e., blood and body fluid precautions should be ordered for every patient.

termining the type of hepatitis petitioner had previously suffered.

The Commission rejected that opinion and, specifically crediting the testimony of Drs. Greaves and Henderson, and relying on the CDC Guidelines, concluded that the Hospital, based on petitioner's medical history, had a reasonable basis for suspecting that petitioner was infectious, and that the decision to place him on blood and body fluid precautions was not discriminatory. Our own review of the evidence presented at the hearing persuades us that there was a substantial basis for that conclusion. *Pro–Football, Inc. v. District of Columbia Department of Employment Services*, 588 A.2d 275, 278 (D.C.1991); *Cohen v. Rental Housing Commission*, 496 A.2d 603, 605 (D.C.1985). Accordingly, we affirm the Commission's holding that implementation of blood and body fluid precautions was not ordered for a discriminatory purpose.

### IV. Denial of Access to the Psychiatric Unit

■ The Commission found that petitioner was excluded from the hospital psychiatric unit because the Hospital perceived petitioner to be HIV-infected. This finding is not contested by the Hospital. Such exclusion is not, in itself, a violation of the HRA, if the health care provider can show business necessity for the exclusion, *see* D.C.Code § 1–2503(a) (1992 Repl.); however, the Hospital made no effort to do so. Accordingly, the Commission ruled that the exclusion of petitioner from the unit violated the HRA and the Hospital does not challenge that ruling.

The Commission also concluded, however, that the services and facilities were not denied on the basis of petitioner's sexual orientation. Petitioner challenges that conclusion, alleging that his "sexual orientation became a proxy for HIV infection, as far as the doctors were concerned." The evidence discussed in Part III.—petitioner's medical history, the testimony of petitioner's attending physicians, and the testimony of the two epidemiology experts—supports a conclusion that the Hospital implemented blood and body fluid precautions based on valid medical concerns, rather

than on petitioner's sexual orientation. The same evidence supports the Commission's conclusion that petitioner's exclusion from the psychiatric unit was not based on his sexual orientation, but rather on a combination of factors in his medical history, leading the Hospital to perceive petitioner to be HIV-infected.

Moreover, the Director of Consultation Liaison Psychiatry at the Hospital, Dr. Dove, testified that had petitioner's HIV antibody test come back negative, he would have been admitted to the unit. Dr. Lewis–Hall, an inpatient psychiatrist and instructor at the Hospital, testified that as of 1986, when she began working at the Hospital, homosexual patients were routinely treated in the psychiatric unit. Furthermore, petitioner, himself, testified that the staff informed him that the results of his antibody test would be the determinative factor as to whether he would be transferred to the psychiatric unit.

■ We conclude that this evidence amply supports the Commission's determination that petitioner was not denied access to the unit because of his sexual orientation. Instead, it supports the Commission's conclusion, noted above, that petitioner was denied access based on the staff's perception that he was HIV-infected. Such a denial, as noted, violates the HRA only if the Hospital is unable to establish business necessity. Since no claim or showing of business necessity was made, we affirm the Commission's decision that denial of access was based on the perception of HIV infection, without a showing of business necessity, but not because of petitioner's sexual orientation.

### V. Damages

Petitioner challenges the Commission's conclusion that he was not entitled to a damage award. Based on our determination that petitioner's claim pertaining to the HIV test was properly filed within one year of the alleged discrimination, we remand that portion of the Commission's order to determine what damages, if any, petitioner

suffered as a result of the discriminatory test.

Petitioner also claims that the Commission erred when it failed to award him damages for the discrimination he suffered as a result of being excluded from the psychiatric ward because of a perceived HIV infection, without a showing of business necessity for the exclusion. Specifically, he claims that he is entitled to damages for the humiliation and embarrassment he suffered, as well as for emotional distress and pain and suffering. The Commission's Guidelines state, *inter alia*, that "[t]he natural and unavoidable consequences of any unlawful discriminatory act or practice are personal embarrassment, humiliation, and indignity, and the prevailing complainant shall be entitled to such damages as are proved by competent evidence as defined in § 213." 31 D.C.Reg. § 211.1, at 6264 (1984).

The Commission concluded that a petitioner who is perceived to be handicapped is entitled to damages for humiliation and embarrassment, if there is reliable and probative evidence to support such an award. The Commission found, however, citing § 213.4, that there was no reliable evidence that petitioner's care providers made any humiliating remarks to him, and that finding is supported by the record. Section 213.4 qualifies § 211 of the Guidelines, and provides that damages may only be awarded if there is "reliable and probative evidence" which gives the Commission a reasonable basis to assess the amount of damages or other compensation. 31 D.C.Reg. § 213.4, at 6266 (1984).

■■■■ We question whether the Commission has properly applied its Guidelines. In its final order, the Commission ruled that an award for damages for humiliation,

embarrassment and indignity "can be awarded if reliable and probative evidence exists." It is not clear whether the Commission concluded there must be reliable evidence to establish that petitioner was humiliated, or whether reliable evidence is required to enable the Commission to determine the amount of the damage award. Section 213.4 requires reliable evidence to determine "the *amount* of damages," but not to determine *if* damages were suffered. Because § 211 provides that humiliation, embarrassment and indignity flow *naturally* from a finding of discrimination, we remand to the Commission to specifically address the points raised, and to determine whether at least some damages should have been awarded.[7] *See also Johnson v. Hale*, 940 F.2d 1192, 1193 (9th Cir.1991) (humiliation may be inferred from the circumstances surrounding the discriminatory conduct, and no medical evidence of mental or physical symptoms stemming from the humiliation need be submitted); *Seaton v. Sky Realty Company, Inc.*, 491 F.2d 634, 636–37 (7th Cir.1974) (same).

Finally, the Commission also denied petitioner's claim for damages as a result of his alleged pain and suffering and emotional distress. The Guidelines provide:

> If, as a result of the unlawful discriminatory acts or practices of the respondent, the prevailing complainant was required to undergo medical or psychiatric treatment, or, where no medical treatment was undergone, there exists evidence of anguish, pain, and suffering (e.g., headache, nausea, nervousness, insomnia, irritability, loss of weight), he or she shall be entitled to damages proved by competent medical evidence thereof, as defined in § 213....

31 D.C.Reg. § 213.4, at 6264 (1984). In addition, a prevailing complainant is enti-

7. Petitioner also claims that the Commission improperly failed to "consider whether the unlawful discriminatory acts or practices were accompanied by aggravating factors," as is authorized by the Guidelines. *See* 31 D.C.Reg. § 211.2, at 6264 (1984). Specifically, he contends that the "aggravating factor" present here was the Hospital's willful or repetitious discriminatory conduct, "causing unusual inconvenience." Petitioner does not describe, however, what "unusual inconvenience" he suffered;

rather, he simply reiterates his argument that the Hospital failed to render necessary psychiatric care to him. Moreover, based on our previous holding that the evidence did not establish a continuing violation, we conclude that there was no "repetitious discriminatory conduct." Though the Commission did not specifically address this issue, there is no basis in the record upon which the Commission could find that "aggravating factors" were involved or that punitive damages were warranted.

tled to reimbursement for expenses incurred for any physiological, psychological, or emotional damages resulting from the HRA violation. 31 D.C.Reg. § 205.1, at 6262 (1984). Such damages, however, may only be awarded if there is "reliable and probative evidence" which gives the Commission a reasonable basis to ascertain the amount of damages. 31 D.C.Reg. § 213.4, at 6266 (1984).

■■■ The Commission found that there was no medical evidence in the record upon which it could base an award for pain and suffering. In support of his claim, petitioner points to evidence showing him to be depressed and suicidal *at the time of his hospitalization,* and that he suffered from *longstanding* depression, feelings of isolation, and suicidal tendencies (emphasis added). In addition, his own expert witness testified that petitioner probably suffered from a paranoid personality disorder, which is defined as a *"longstanding* way that a person kind of approaches the world" (emphasis added). Clearly missing from the record is evidence linking petitioner's psychological and mental problems to his exclusion from the psychiatric unit. Indeed, the evidence showed that petitioner had made previous suicide attempts, had been involved in counseling since an early age, had continuing drug and alcohol problems, and had suffered from depression and mood swings—all prior to his hospitalization. Although petitioner and his friends testified that he was "worse" when he got out of the hospital, there is ample support for the Commission's finding that petitioner presented no evidence linking his condition to the Hospital's discriminatory conduct. Accordingly, we conclude that there was substantial evidence in this record from which the Commission could find that petitioner is not entitled to a damage award under §§ 205 and 210.[8]

For the reasons stated, the Commission's decision is hereby affirmed in part, reversed in part, and the case is remanded to the Commission for further proceedings in accordance with this opinion.

*So ordered.*

FERREN, Associate Judge, concurring:

I concur in the majority opinion but believe it is important, for the sake of clarity, to make two points.

First, in Part II concerning the alleged statute of limitations bar, the majority states that "no legal discrimination could occur until the blood was actually tested." I agree that the actual testing of the blood is a discrete, discriminatory act under the circumstances and thus that the statute does not bar the claim. This is not to say, however, that the act of drawing blood itself could not also be a discrete, discriminatory act justifying (presumably lesser) recovery. The majority apparently accounts for this possibility in footnote 4 indicating that such a claim would be time barred. I simply want to stress, therefore, that theoretically there can be two discriminatory aspects of a blood test on this record: one barred by the statute of limitations, the other not.

Second, and more importantly, I want to emphasize that nothing in the majority opinion should be understood to support an argument that sexual orientation, without a medical history of sexually transmitted diseases, can serve as a proper basis for any discriminatory treatment. Nor, as I see it, can sexual orientation properly be considered even a high risk factor absent such a medical history. Any reference to homosexuality in this case as a high risk factor, therefore, is relevant only because of the history of sexually transmitted diseases.

---

8. Before the hearing examiner, petitioner argued that he was entitled to punitive damages. The examiner and the Commission concluded, without deciding whether they had the authority to award such damages, that the exclusion of petitioner from the psychiatric unit did not rise to the level of willfulness and egregiousness necessary for an award of punitive damages. Petitioner did not challenge that conclusion in his petition to this court, and we do not consider it. *See Cratty v. United States,* 82 U.S.App. D.C. 236, 243, 163 F.2d 844, 851 (1947) (issues not addressed in briefs are ordinarily waived).