**Alakananda PAUL, Appellant,**

v.

**HOWARD UNIVERSITY,
et al., Appellees.**

**No. 96–CV–483.**

District of Columbia Court of Appeals.

Argued Oct. 30, 1997.
Decided May 25, 2000.

---

Robert L. Bell, Washington, DC, for appellant.

Timothy F. McCormack, with whom Charles S. Fax, Dana M.S. Wilson, Baltimore, MD, and Norma C. Leftwich, Washington, DC, were on the brief, for appellees.

Before TERRY, STEADMAN, and RUIZ, Associate Judges.

TERRY, Associate Judge:

Appellant, Dr. Alakananda Paul, filed a nine-count complaint[1] against Howard University, her former employer, and several of its administrators[2] after she failed to receive a tenured position at the University. Her complaint alleged breach of contract, intentional infliction of emotional distress, interference with contractual relations and prospective advantage, breach of an implied covenant of good faith and fair dealing, breach of an implied-in-fact employment contract, conspiracy, and retaliation and discrimination under the District of Columbia Human Rights Act ("DCHRA"). The trial court granted summary judgment for the defendants as to all counts, ruling that Dr. Paul's DCHRA claims were barred by the statute of limitations and that the undisputed facts failed to support her remaining claims. We affirm.

I

A. *Dr. Paul's Employment History*

Dr. Paul began teaching at Howard University in July 1986, when the University granted her a three-year probationary

---

1. Appellant's original complaint contained only two counts, but she later filed an amended complaint with seven additional counts.

2. Named as defendants in Dr. Paul's complaint were Dr. James Momoh, Chairman of the Department of Electrical Engineering; Dr. Gary Harris, Chairman of the Electrical Engineering Departmental Appointment, Promotions, and Tenure Committee; Dr. M. Lucius Walker, Dean of the School of Engineering; and Dr. James H. Johnson, Acting Dean of the University in 1995.

appointment[3] as an associate professor in its Electrical Engineering department. She continued as a tenure track associate professor until May 31, 1993.[4] At that point, Dr. Paul had been an associate professor for seven years, the maximum allowable probationary period under the rules of the University. *See* HOWARD UNIVERSITY MANUAL, FACULTY HANDBOOK: EMPLOYMENT AND TENURE POLICIES GOVERNING FACULTY POSITIONS (1980) (hereafter "1980 Handbook"), *Policy on Tenure,* § C(3); 1993 HOWARD UNIVERSITY FACULTY HANDBOOK (hereafter "1993 Handbook"), § 2.5.3. The University offered her a temporary position as a lecturer for one academic year, from August 1, 1993, through May 31, 1994. Such temporary appointments at the University are not tenure track positions, and in accepting the University's offer, Dr. Paul signed a contract that waived "any right to a claim of tenure as well as any years of employment attributable to tenure with the University." The contract also stated that it contained "no representations, warranties, promises, covenants, or undertakings other than those expressly set forth herein."[5] *See* 1993 Handbook, § 2.5.4.

The University initially decided not to renew this appointment and on July 5, 1994, sent a letter to Dr. Paul asking her to return any keys and University property. When she failed to respond, the University sent her a second letter on September 8, 1994, but Dr. Paul refused to vacate her office. Her status during the 1994–1995 academic year is not clear from the record, but at some point Dr. Paul was offered an additional one-year lecturer appointment for 1995–1996. She signed the proposed contract, but changed "lecturer" to "associate professor" and struck the language waiving any claim to tenure. Upon receiving the altered document, the University notified Dr. Paul that it considered her reply to be a rejection of its offer. The parties did not pursue the matter further, and on July 8, 1995, Dr. Paul's employment at the University officially ended.

## B. *Dr. Paul's 1992 and 1993 Tenure Applications*

During her time at the University, Dr. Paul submitted two applications for tenure in 1992 and 1993, both of which were rejected. In October 1992, approximately seven months before her final probationary appointment was to expire, Dr. Paul submitted her first application for tenure. On October 26 the Electrical Engineering Departmental Appointments, Promotions, and Tenure Committee ("the Department Committee") unanimously voted not to recommend her for tenure because she had "very poor" research activity, "below average" professional development, and "average" teaching ability and service performance.[6] On November 9 Dr. Paul was notified that her tenure application had been denied. On November 24, 1992, she wrote a memorandum to Dr. James Momoh, Chairman of the Department of

3. Probationary appointments are considered "tenure track" positions because appointees become eligible to apply for tenure after completion of a probationary term.

4. After her first term as an associate professor expired, Howard awarded Dr. Paul two additional probationary appointments, one for three years and one for a single year.

5. Dr. Paul alleged that she accepted the lecturer position with the understanding that she would receive tenure and that the contract was designed to allow her to continue her employment at the University until the approval process was completed. That allegation, however, can have no effect on the outcome of this case. "[W]here contract language is not ambiguous, summary judgment is appropriate because 'a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.'" *Byrd v. Allstate Insurance Co.,* 622 A.2d 691, 693 (D.C.1993) (citation omitted).

6. On the same date, the same Department Committee also reviewed the tenure applications of three other associate professors and voted not to recommend any of them for tenure.

Electrical Engineering, expressing her disappointment and reiterating her accomplishments at the University.

In October 1993, during her temporary term as a lecturer, Dr. Paul applied for tenure a second time. Although the 1993 Handbook and her employment contract both made clear that she had no right to be considered for tenure, the Department Committee reviewed her application; again, however, it voted not to recommend her for tenure. Dr. Paul was notified of this decision in a memorandum dated December 1, 1993.

The Department Committee forwarded Dr. Paul's application to the school-wide Appointments, Promotions, and Tenure Committee ("the School Committee") on January 21, 1994.[7] The School Committee recommended her for tenure and sent the matter back to the Electrical Engineering department on February 23, 1995. Notwithstanding the recommendation of the School Committee, Dr. Lucius Walker, Dean of the School of Engineering, sent Dr. Paul a letter on May 2, 1995, stating that he would not support her application and that he had forwarded his evaluation to Dr. James Johnson, Acting Dean of the University. Dr. Johnson, noting that he did not support the application because Dr. Paul's publication and teaching effectiveness record was below that of her peers, sent the application to Dr. Orlando Taylor, Vice President for Academic Affairs, on May 12, 1995. Dr. Taylor forwarded the materials to the Interim President of the University, Dr. Joyce Ladner, who officially denied the application. Dr. Johnson informed Dr. Paul of that final decision on July 7, 1995.

## C. *Dr. Paul's Complaint to the Faculty Grievance Commission*

After her first tenure application was denied and while her second application was still pending, Dr. Paul filed a grievance with the Faculty Grievance Commission ("the Commission") on May 14, 1994. In the grievance Dr. Paul complained that her tenure applications had been mishandled, that she had been wrongfully denied tenure, and that she was the victim of sex discrimination and retaliation. The Commission, which had no authority to grant or deny tenure, ultimately determined that her claims of retaliation and discrimination were groundless but that she was qualified to receive tenure as a result of her endorsement by the School Committee in 1995.[8]

## D. *The Tenure Consideration Process under the Faculty Handbooks*

There are two faculty handbooks involved in this case, both of which set forth explicit procedures for the University to follow in its consideration of tenure applications. At the time Dr. Paul was hired in 1986, the 1980 Handbook governed employment policies and procedures.[9] The 1980 Handbook was replaced by the 1993 Handbook, which expressly superseded "all prior faculty handbooks." Therefore, the 1980 Handbook was applicable when Dr. Paul submitted her first tenure appli-

---

7. Although the Department Committee initially determined that none of the tenure applications would be forwarded to the School Committee, Dr. Paul's application was eventually sent to that committee after she filed a grievance with the Faculty Grievance Commission.

8. The Commission also stated that Dr. Paul should receive tenure because of what it termed serious procedural violations, but these related mainly to the 1992 application, which we discuss at pages 306–07, *infra*. In any event, even if there were procedural irregularities so great as to invalidate the pro-

ceedings, the remedy would have been to go back and start the process over, not to grant lifetime tenure to someone who did not meet the substantive requirements for tenure.

9. Dr. Paul asserts that the University's 1969 Handbook also applied to her employment. She offers no basis for this assertion, however, and we see no reason to refer to that handbook. To the extent that its provisions may be different from those in the 1980 Handbook, the latter would clearly apply to Dr. Paul, who was first hired six years after its publication.

cation in 1992, and the 1993 Handbook was applicable when she applied for tenure the second time in October 1993.

The 1980 Handbook provided that after the completion of a probationary period of at least three years and not more than seven years, an appointee became eligible for consideration of indefinite tenure and could submit an application to the Department Committee. 1980 Handbook, *Policy on Tenure*, § C(3). If the application had the support of a majority of the Department Committee, the recommendation was forwarded to the School Committee. If the School Committee also recommended the application, it was sent to the Dean of the appropriate school or college, who forwarded it, along with the recommendations of both Committees and the Dean's assessment of the applicant, either to the Vice President for Academic Affairs or to the Vice President for Health Affairs, whichever was appropriate. *Id.* at § C(5)-(7). Finally, the Vice President forwarded the materials to the President of the University for presentation to the Board of Trustees, which made the final decision on tenure. *Id.* at § C(7). The 1980 Handbook made clear that tenure was not presumed, regardless of the number of probationary terms that an applicant had completed. The Board of Trustees granted tenure to an individual only if he or she (1) had completed the probationary period, (2) met the qualifications for indefinite tenure prescribed by the particular school or college involved, (3) had been formally recommended by the appropriate faculty,[10] and (4) had been approved and recommended by the President of the University. *Id., Employment Policies Governing Faculty Positions*, § D(3).

The tenure consideration process set forth in the 1993 Handbook is similar to that in the 1980 Handbook. First, the department in which the appointee is employed reviews the application and votes on whether to recommend tenure. 1993 Handbook at § 2.7.4.6.1. Unlike the 1980 Handbook, however, the 1993 Handbook provides that the department must submit its decision, whether positive or negative, to the School Committee. If the School Committee does not recommend tenure, the applicant may appeal that decision to the Faculty Grievance Commission before the appropriate Vice President reviews the petition. *Id.* at § 2.7.4.6.2. The Vice President then assesses the application and notifies the candidate and the department of his or her decision. *Id.* at § 2.7.4.6.3. The President and Board of Trustees review the application only if the Vice President recommends tenure, and tenure may be awarded by the Board of Trustees only upon the recommendation of the President of the University. *Id.* The criteria for tenure are "excellence in carrying out the responsibilities of the position and unusual promise for continued achievement." *Id.* at § 2.7.4.4.[11]

## II

As a preliminary matter, we must determine whether the trial court followed the correct procedure in considering appellees' motion for summary judgment. Dr. Paul contends that the trial court incorrectly applied Civil Rule 56(e) by improperly shifting to her the burden imposed on appellees, as the movants, under Rule 56(c).

Rule 56 (b) provides:

[A] party against whom a claim ... is asserted ... may, within the time prescribed by the court order, move with or without supporting affidavits for a sum-

---

10. The Trustees deferred to the opinion of the relevant faculty because "scholars in a particular field of activity have the chief competence for judging the work of their colleagues." 1980 Handbook, *Policy on Tenure*, § D(1).

11. Teaching, research achievement, scholarly development, professional development, public service, advising students, and contributions to the Department and to the University are all considered "responsibilities" of a faculty member. 1993 Handbook at § 2.7.4.4.

mary judgment in the party's favor as to all or any part thereof.

It is well established that the moving party bears the burden of showing the absence of material issues. *See, e.g., Ferguson v. District of Columbia,* 629 A.2d 15, 19 (D.C.1993); *Burch v. Amsterdam Corp.,* 366 A.2d 1079, 1084 (D.C.1976). At this initial stage, the movant must inform the trial court of the basis for the motion and identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c) [12]); *accord, e.g., Musa v. Continental Insurance Co.,* 644 A.2d 999, 1002 (D.C. 1994) (citing *Celotex* ).

■ Once the movant makes the required initial showing, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). The burden is thus shifted to the non-moving party to make a *prima facie* showing of facts supporting each claim or defense. *Ferguson,* 629 A.2d at 19; *Nader v. de Toledano,* 408 A.2d 31, 48 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Unless the non-moving party counters the allegations of the moving party with specific facts, the motion for summary judgment will be granted. *Miller v. American Coalition of Citizens with Disabilities, Inc.,* 485 A.2d 186, 191 (D.C.1984). Conclusory allegations are not enough to establish a genuine issue of material fact. *Musa,* 644 A.2d at 1002. Then, after the opposing party has presented evidence, the trial court consid-

ers the affidavits submitted by both parties, determines whether they are proper under Rule 56(e),[13] and may grant the motion only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ...." Rule 56(e).

■ We reject Dr. Paul's contention that the trial judge failed to follow the procedure required by Rule 56. The record shows that appellees met their initial burden by filing, along with their motion for summary judgment, supporting affidavits and a comprehensive memorandum stating the basis for the motion as to each count of Dr. Paul's complaint and identifying the materials in support of the motion. Because appellees met their initial burden, the trial court properly shifted the burden to Dr. Paul to make a *prima facie* showing of factual support for each of her claims. She responded with an affidavit. The trial court considered all of the applicable materials and concluded that there was no issue as to any material fact. On the record before us, we discern no procedural irregularities under Rule 56.

We turn, therefore, to the merits of appellees' motion.

### III

■ Dr. Paul contends that the trial court erred in granting summary judgment because there are genuine issues of material fact as to each of her several claims. In considering an appeal from a summary judgment, we view the record in the light most favorable to the non-moving party, giving to that party the benefit of "all favorable inferences that can be drawn from the evidence." *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983). Neverthe-

---

**12.** The local rule applicable here, Super. Ct. Civ. R. 56(c), contains identical language.

**13.** Rule 56(e) provides that all affidavits "shall be made on personal knowledge, shall

set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

less, even under this lenient standard, we conclude that Dr. Paul failed to demonstrate that there was an issue of material fact as to any of her claims; consequently, we must affirm the judgment.

### A. Breach of Contract—The Faculty Handbooks

Dr. Paul's principal claim is that the University breached an employment contract when it failed to grant her a permanent tenured position. She asserts that the faculty handbooks gave her contractually enforceable rights as an employee of the University[14] and that the University infringed these rights in two respects. First, she maintains that the University violated her right to receive tenure automatically upon completion of her seven-year probationary term as an associate professor. Second, she contends that the University violated her procedural rights under the handbooks throughout the process of considering her applications for tenure.[15]

■ We address Dr. Paul's first argument only briefly. She contends that the completion of her tenure track appointments as an associate professor automati-

cally entitled her to tenure.[16] There is absolutely nothing in the record to support this allegation. Both applicable faculty handbooks provide that an appointee may *apply* for tenure upon completion of a probationary appointment, but it is absolutely clear that the appropriate University officials make the final decision on whether to award tenure to any applicant. The University was thus entitled to judgment as a matter of law as to this aspect of Dr. Paul's claim.[17]

■ The second part of Dr. Paul's breach of contract claim warrants a bit more discussion. She contends that her first tenure application, submitted in 1992, should have been forwarded to the School Committee immediately upon the Department Committee's decision not to recommend her for tenure. Instead, the Department Committee did not forward the application until 1994, after she filed a complaint with the Faculty Grievance Commission. As we have said, the 1980 Handbook was applicable to Dr. Paul's 1992 tenure application. The relevant provisions of that handbook state:

1. The holding of tenure shall be limited to the ranks of Professor and

---

14. There appears to be no dispute that under the handbooks Dr. Paul had at least some contractual rights as an employee. *See, e.g., Washington Welfare Ass'n v. Wheeler*, 496 A.2d 613, 615 (D.C.1985).

15. Dr. Paul also asserts that the "custom and practice" of the University gave her certain contractual rights. *See Bason v. American University*, 414 A.2d 522, 525 (D.C.1980). However, she failed to identify any such custom or practice with particularity, nor did she present any evidence that it was well known and established; consequently, any claim based on "custom and practice" could not survive the motion for summary judgment. *See Howard University v. Best*, 547 A.2d 144, 151 (D.C.1988) (*"Best II"*) ("In order for a custom and practice to be binding on the parties to a transaction, it must be proved that the custom is definite, uniform, and well known, and it must be established by clear and satisfactory evidence" (citations and internal quotation marks omitted)).

16. In support of this contention, Dr. Paul also argues that she was not an employee at will

because she held positions with fixed terms. *See, e.g., Nickens v. Labor Agency of Metropolitan Washington*, 600 A.2d 813, 816 (D.C. 1991). The trial court addressed this argument, ruling that she was an employee at will, but it did so only in the context of her retaliation claim. In any event, whether or not she was an employee at will is not relevant to her asserted right to receive indefinite tenure. Even assuming that she was not an employee at will, her alleged status as a fixed-term employee would simply mean that the University was obligated to follow certain procedures before discharging her, *see Washington Welfare Ass'n, supra* note 14, 496 A.2d at 615–616, not that she would automatically receive tenure.

17. Dr. Paul also appears to contend that the endorsement of the School Committee and the Faculty Grievance Commission entitled her to receive tenure. Because only the Board of Trustees has authority to grant tenure, this contention has no merit.

Associate Professor; and ... Assistant Professors may be granted tenure in exceptional cases.

\* \* \* \* \* \*

3. The probationary period for the awarding of tenure, in all schools and colleges, shall be not more than seven (7) years and not less than three (3) years ....

\* \* \* \* \* \*

5. All recommendations for tenure, at the departmental level, shall have the support of the majority of the members of the departmental Committee on Appointments, Promotion, and Tenure ... and ... the recommendations of the departmental committee, together with the judgment of the departmental chairman, shall be forwarded to the school or college committee in the care of the Dean of the school or college.

1980 Handbook, *Policy on Tenure*, § C. The handbook thus requires that *recommendations* of the Department Committee be sent to the School Committee and defines a "recommendation" as a majority decision to support the application. After reviewing Dr. Paul's 1992 tenure application, the Department Committee unanimously voted not to support it. There was thus no departmental recommendation for tenure, and for that reason the Department Committee was not obligated to forward her application to the School Committee. In any event, Dr. Paul does not explain how any perceived procedural deficiencies in the University's handling of her first tenure application prejudiced her second application, which was considered and rejected on the merits.

 Dr. Paul also asserts various procedural errors in the University's consideration of her 1993 tenure application, which was governed by the 1993 Handbook. Under that handbook, Dr. Paul had no contractual right to re-apply for tenure be-

cause she held a lecturer position rather than a probationary appointment. According to the handbook, lecturer positions are temporary appointments for a specific term. "Since these appointments are not tenure track positions, persons holding such appointments are not eligible for tenure, educational leave, or sabbatical leave." 1993 Handbook, § 2 .5.4.[18] Nevertheless, the University gave her application full consideration, actually according her more process than she was entitled under the 1993 Handbook to receive. Any procedural defect in that consideration cannot support her breach of contract claim because she had no contractual right to consideration of any kind.

### B. *Emotional Distress*

 To establish a *prima facie* case for intentional infliction of emotional distress, a plaintiff must show "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Howard University v. Best*, 484 A.2d 958, 985 (D.C.1984) ("*Best I*") (citation omitted). "The requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C.1994) (citation omitted). Moreover, this court has been particularly demanding as to the proof required to support a claim of intentional infliction of emotional distress in an employment context. *See Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C.1997). Dr. Paul alleged that she suffered from heightened levels of stress, high blood pressure, and disrupted sleep as a result of appellees' allegedly outrageous conduct. She claimed that they wrongfully denied her tenure, reassigned her students and grants, requested that she vacate her office after her employment at the University had expired, and otherwise discriminated against her. The actual evidence

18. In addition, Dr. Paul expressly waived "any right to claim of tenure as well as any years of employment attributable to tenure with the University" when she signed the 1993 employment contract for the lecturer position.

before the court, however, even when viewed in the light most favorable to Dr. Paul, does not show that appellees' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Jackson v. District of Columbia,* 412 A.2d 948, 957 (D.C.1980) (citation omitted).

First, as we have explained, Dr. Paul's allegations that appellees wrongfully denied her tenure are unfounded because she had no automatic right to receive tenure. Nor did appellees violate her procedural rights under either of the faculty handbooks. Second, once Dr. Paul's employment at the University ended, no reasonable person could say that appellees acted outrageously by asking her to vacate her office and by reassigning her responsibilities to others.[19] *See, e.g., Smith v. Union Labor Life Insurance Co.,* 620 A.2d 265, 269–270 (D.C.1993) (dismissal without following disciplinary procedures was not extreme and outrageous); *Adams v. George W. Cochran & Co.,* 597 A.2d 28, 35 (D.C. 1991) (fact that employee was fired for refusing to violate the law was not extreme and outrageous); *Waldon v. Covington,* 415 A.2d 1070, 1077–1078 (D.C.1980) (allegations that defendant refused to give plaintiff keys to laboratory, failed to notify him of departmental meetings, threatened to institute action against him, and assigned him to teach classes in order to embarrass him were insufficient to show a calculated plan "to cause emotional distress and a concomitant risk of physical injury").

Finally, Dr. Paul's claims of discrimination are based on allegations that members of the Electrical Engineering department referred to the Society of Women Engineers as the "Society of Weak Engineers"[20] and that the department did not have any tenured female faculty members. Dr. Paul contends that this allegedly discriminatory conduct was extreme and outrageous because it violated the District of Columbia Human Rights Act. In *Best I* we held that a plaintiff may establish a *prima facie* case of intentional infliction of emotional distress by demonstrating repeated sexual harassment by a supervisor. 484 A.2d at 985–986. However, we limited the holding to cases in which the plaintiff can show "a pattern of harassment." *Id.* at 986. In this case Dr. Paul has shown, at most, a few isolated incidents.[21] That is not sufficient to establish a *prima facie* case under *Best I. See id.* at 980. Because there is no actual evidence in the record that could support a finding that appellees intentionally inflicted extreme emotional distress on Dr. Paul, the trial court correctly granted summary judgment against her on that claim.[22]

### C. Interference with Contractual Relations and Prospective Advantage

Dr. Paul alleged that the four individual appellees—Walker, Momoh, Johnson, and Harris—intentionally interfered with her right to contractual relations with Howard University and that they and the University interfered with prospective advantages and contractual relations between herself and two independent companies. To establish a *prima facie* case of intentional interference with

**19.** Dr. Paul does not contend that she was wrongfully discharged.

**20.** There was no showing of when or how often this reference was made.

**21.** It is well established the employee has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993); *Miller v. American Coalition of Citizens with Disabilities, Inc., supra,* 485 A.2d at 190.

**22.** Nor did Dr. Paul present more than conclusory allegations that she actually suffered from severe emotional distress. "Mere conclusory allegations on the part of the nonmoving party are insufficient to stave off the entry of summary judgment." *Musa,* 644 A.2d at 1002.

contractual relations, Dr. Paul had the burden of showing (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.[23] *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C.1989) (citation omitted). Running parallel with this tort is the tort known as interference with prospective business advantage. *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C.1986). To establish a *prima facie* case of interference with prospective advantage, Dr. Paul had to show "that the interference was intentional and that there was resulting damage." *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 289 (D.C.1977).

■ We first address Dr. Paul's contention that the four individual appellees interfered with her contractual relations with the University. In *Press v. Howard University*, 540 A.2d 733 (D.C.1988), we held that officers of a University act as the University's agents and thus cannot be held liable for tortiously interfering with a contract between the University and a third party. *Id.* at 736 ("the University through their actions could not tortiously interfere with its own contract" (citing cases)); *accord, Nickens, supra* note 16, 600 A.2d at 819–820. Other supervisory employees may lawfully interfere with a contract between their employer and a third person, but only for "proper purposes." *Sorrells*, 565 A.2d at 291. Therefore, in order to recover for interference with contractual relations by a supervisor who is not an officer, a plaintiff must present evidence that the supervisor acted with malice. *Id.* at 291–292.

■ Dr. Paul contends that Walker, Momoh, Johnson, and Harris intentionally interfered with her alleged right to indefinite tenure and to "equal employment opportunity" at Howard University. Once again we reiterate that Dr. Paul had no contractual right to indefinite tenure; hence the four individual appellees could not have interfered with her contractual relations with the University on that ground. As to her other allegations of unfair treatment, there is no evidence in the record that these appellees intentionally interfered with the University's performance of any contract with Dr. Paul, that any of them acted with malice,[24] or that Dr. Paul suffered pecuniary loss from any alleged malicious conduct.[25] Consequently, there was insufficient evidence to sustain Dr. Paul's claim that appellees intentionally interfered with her contractual relations with the University.

■ Dr. Paul also contends that appellees interfered with her prospective advantages and contractual relations with two independent companies, Martin Marietta Corporation and Communications Satellite Corporation (Comsat). The record is almost totally devoid of any evidence that even mentions these companies. The only references to Martin Marietta are in a letter from Dr. Walker dated July 21, 1994, stating that he was "unable to approve an application to submit a proposal to Martin Marietta Government Electronic Systems" and a letter from Dr. Paul her-

---

23. The Restatement declares:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 (1979).

24. Whether a supervisor acted with malice is a factual question, and "summary judgment on the issue is rarely appropriate." *Nickens, supra* note 16, 600 A.2d at 820. However, when a plaintiff has presented no evidence of malice, as in this case, summary judgment for the defendant is warranted and will usually be upheld.

25. We need not decide which, if any, of the individual appellees were officers because the undisputed facts show that they were all in supervisory positions in relation to Dr. Paul.

self to Dr. Ladner, Interim President of the University, requesting that she resolve the Martin Marietta matter "before the contract is lost for Howard University." From these letters it appears that Dr. Paul was attempting to submit a proposal to Martin Marietta for a grant to the University, and that the University refused to give her the necessary authority to write the proposal. The sole reference to Comsat in the record is in a memorandum making arrangements for another employee to manage a grant from Comsat after Dr. Paul's lecturer contract had ended. As to both contracts, it appears that Dr. Paul was working on behalf of the University to secure and/or manage grants *to the University.* There is no evidence whatever that Dr. Paul personally had a contract, or even a prospective contract, with either company. Since appellees cannot be held liable for interfering with the University's relations with Martin Marietta and Comsat, *see Press, supra,* summary judgment on these claims was appropriately granted.

### D. *Conspiracy*

 To establish a *prima facie* case of civil conspiracy, Dr. Paul had to prove (1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the

parties to the agreement pursuant to, and in furtherance of, the common scheme. *Griva v. Davison,* 637 A.2d 830, 848 (D.C. 1994). Although Dr. Paul made several conclusory statements in her complaint that appellees had engaged in a conspiracy against her,[26] she alleged no specific facts to support these assertions, and the record contains no actual evidence of an agreement between or among any of the appellees to commit an unlawful act against Dr. Paul. When a plaintiff does not allege and prove such an agreement, summary judgment is proper. *Id.* at 849.[27]

### E. *Good Faith and Fair Dealing*

 This court has held that all contracts contain an implied duty of good faith and fair dealing, which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hais v. Smith,* 547 A.2d 986, 987 (D.C.1988) (citation omitted).[28] If a party to the contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing. *Id.* at 987–988.

 In her complaint, Dr. Paul alleged that appellees were bound by a covenant,

---

26. Dr. Paul alleged that appellees "have been engaged in a continuing conspiracy to deny [her] ... contractual, statutory, and [*sic*] rights to equal employment opportunity, including her rights to indefinite tenure, to be treated without regard to sex and her national origin, to engage in protected activities and to advance within ... Howard University as have male employees of [the] University."

27. We note, moreover, that conspiracy is not an independent tort but only "a means for establishing vicarious liability for [an] underlying tort." *Griva,* 637 A.2d at 848; *see also Elliott v. Healthcare Corp.,* 629 A.2d 6, 9 (D.C. 1993). Because Dr. Paul's conspiracy claim fails as a matter of law, we need not decide whether her complaint stated a claim for an underlying tort.

28. Appellees, citing only federal cases, assert that the District of Columbia does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing. This is plainly incorrect. *See Kerrigan, supra,* 705 A.2d at 626 n. 2 (treating claim for breach of covenant of good faith and confidentiality as one for breach of covenant of good faith and fair dealing); *Hais, supra,* 547 A.2d at 987–988. However, such a claim cannot be made by an at-will employee because there is no contract to provide a basis for the covenant. *Kerrigan,* 705 A.2d at 627. We need not decide whether or not Dr. Paul was an at-will employee because, as we have discussed in part III–C, even assuming that she was not, she failed to present any evidence that appellees destroyed or interfered with her right to receive the fruits of a contract.

implied in the faculty handbooks, to "engage in good faith negotiations and [to] deal fairly with [her] in granting her tenure or entering into a new multiyear contract with [her]." She asserted that appellees frustrated her alleged entitlement to tenure and demanded that she "negotiate away her contractual statutory rights to equal employment opportunities and tenure in order to continue her employment relationship with [the University]." Once again, however, Dr. Paul failed to support her allegations with evidence of any action taken by appellees that would violate the implied covenant of good faith and fair dealing. *See Duke v. American University*, 675 A.2d 26, 28 (D.C.1996). The record shows that she had no contractual right to receive tenure automatically and that appellees acted within the standards set forth in the handbooks when considering her tenure applications. As for her assertion that appellees somehow forced her to relinquish "equal employment opportunities," there is nothing in the record to support this conclusory allegation. Consequently, summary judgment for appellees was properly granted on this claim.

### F. Breach of an Implied Contract

■■■ Perhaps realizing that the language in the faculty handbooks did not give her an automatic right to tenure upon the expiration of her probationary appointments, Dr. Paul asserts that she also had an implied contract to the effect that, if she successfully completed the probationary appointments, she would be awarded indefinite tenure. Under the theory of an implied contract, a plaintiff may recover *quantum meruit* upon establishing "(1) valuable services being rendered; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the person rendering the services expected to be paid by him or her." *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C.1993). Importantly,

all the necessary elements of an express contract—including offer, acceptance, and consideration—must be shown in order to establish the existence of an implied-in-fact contract. *Emerine v. Yancey*, 680 A.2d 1380, 1383 (D.C.1996).

■■■ It is in this respect that Dr. Paul's argument fails. The only basis in the record for an enforceable implied contract is Dr. Paul's unsupported statement in her own affidavit that appellees Momoh and Walker "assured" her that she would receive tenure when she signed the contract for a lecturer position. Such alleged "assurance" is plainly insufficient to establish the elements of a binding contract, either express or implied. To the contrary, moreover, is the lecturer contract itself, which expressly stated that Dr. Paul relinquished all rights to receive tenure. Given the actual language of the lecturer contract, the trial court properly rejected Dr. Paul's claim of an implied contract.

### G. The DCHRA Claims

Dr. Paul asserted in her complaint that appellees discriminated and retaliated against her, in violation of the DCHRA. In support of her discrimination claim, she alleged that appellees referred to the Society of Women Engineers as the "Society of Weak Engineers" and that the Electrical Engineering Department did not have any female tenured faculty members. As to her retaliation claim, she alleged that appellees intentionally delayed consideration of her tenure application and attempted to force her out of her office in July and September of 1994 in retaliation for her complaints about discrimination within the department. The trial court, concluding that these claims were time-barred, granted summary judgment for appellees.

■■■ There is a one-year statute of limitations for claims under the DCHRA. D.C.Code § 1–2544(a) (1999); *see Doe v. District of Columbia Comm'n on Human Rights*, 624 A.2d 440, 444 (D.C.1993). "That period begins to run at the time of

the occurrence of the unlawful discriminatory practice, or the discovery thereof." *Jones v. Howard University*, 574 A.2d 1343, 1345 (D.C.1990). Since Dr. Paul filed this suit on May 31, 1995, her DCHRA claims are time-barred if the discriminatory conduct occurred before May 31, 1994. Her complaint does not specifically state when most of the alleged discriminatory and retaliatory conduct occurred. It does say, however, that appellees violated the DCHRA in 1992, if not earlier, when her tenure application was not recommended to the School Committee. In addition, the record shows that on May 14, 1994, she complained to the Faculty Grievance Commission about discriminatory and retaliatory conduct. It is thus evident that Dr. Paul had knowledge of appellees' alleged discriminatory practices well before May 31, 1994, and that her DCHRA claim is therefore barred by the statute of limitations.

Dr. Paul attempts to circumvent the statute by asserting that appellees engaged in "a pattern of continuous and ongoing unlawful behavior." Case law provides that when a plaintiff can show "a series of related acts, one or more of which falls within the limitations period," all of the discriminatory conduct falls within the statute of limitations. *Doe v. District of Columbia Comm'n on Human Rights, supra*, 624 A.2d at 444 n. 5. "To be considered continuing in nature, however, the discrimination may not be limited to isolated incidents, but must pervade a series or pattern of events which continue into the filing period." *Id.* at 445 n. 5 (citation omitted). No such showing has been made on this record. Dr. Paul has offered, at most, unsupported allegations of a few isolated incidents, such as the "Society of Weak Engineers" comment and a remark by Dr. Walker that she was "not a good role model." When she does allege a pattern of conduct (for example, a "pattern

... of discouraging graduate students in the Electrical Engineering Department not to do research under Plaintiffs supervision"), she fails to provide a date *within the one-year statutory period* on which any such conduct occurred. Nor has she offered any evidence, as opposed to conclusory allegations, that appellees' decision to deny her tenure was in retaliation for any protected activity on her part. *See, e.g., Howard University v. Green*, 652 A.2d 41, 45–46 (D.C.1994). As for the University's efforts in July and September 1994 to get her to vacate her office—the only actual events alleged which fall with the statutory period—there is no *evidentiary* basis that would permit a trier of fact to find that these attempts, reasonable on their face,[29] were made in retaliation for any protected conduct under the DCHRA.

### IV

The judgment of the trial court is therefore

*Affirmed.*

---

**29.** By July 1994 Dr. Paul's lecturer contract had expired, and she was no longer an employee of the University; at least, there is nothing in the record to show that she was. In such circumstances we see nothing unreasonable in the University's asking her to vacate her office so that it could reassign the space to someone still on the payroll.