Gaye LIVELY, Appellant,

v.

FLEXIBLE PACKAGING
ASSOCIATION, et
al., Appellees.

No. 97–CV–128.

District of Columbia Court of Appeals.

Argued Sept. 21, 1999.
Decided Jan. 11, 2001.

Thomas L. McCally, Washington, DC, with whom Lawrence E. Eiser, Silver Spring, MD, was on the brief, for appellant.

Alfred F. Belcuore, Chevy Chase, MD, for appellee.

Before REID and WASHINGTON, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

At trial, a jury found appellees Flexible Packaging Association (FPA) and its president, Glenn Braswell, liable to appellant Gaye Lively for intentional infliction of emotional distress and, under the District of Columbia Human Rights Act ("DCHRA"), D.C.Code §§ 1–2501 *et seq.*, for: (1) discrimination due to a hostile work environment; (2) discrimination due to unequal pay; and (3) unlawful retaliation. The jury awarded specific amounts of compensatory damages for each of the four counts, and a single lump sum of punitive damages for all four counts. Following the verdict, appellees filed a motion seeking judgment as a matter of law or, in the alternative, a new trial. The trial court granted judgment as a matter of law on all four counts, and also conditionally granted the alternative relief of a new trial on all counts. Appellant claims error in the overturning of the verdicts. For the reasons that follow, we affirm the grant of judgment as a matter of law on all of appellant's claims.

### I.

FPA is a trade association of companies that manufacture flexible packaging materials. The headquarters in Washington, D.C., with a staff of twenty, lobbies Congress on behalf of its membership. Gaye Lively began working at FPA in 1980 as a secretary. From 1980 to 1986, Mrs. Lively consistently received positive evaluations and corresponding promotions. In 1986, when Mrs. Lively was Director of Administration and Meetings, Glenn Braswell was hired as FPA's president and Mrs. Lively's ultimate supervisor. In 1990, Mrs. Lively became the Director of Membership, a position she held until her termination in 1993. In that role she had responsibility for recruiting new members and retaining current members for the association.

At trial, the jury heard evidence regarding Mrs. Lively's claim that she was sexually harassed on numerous occasions be-

tween 1987 and 1992 by Mr. Braswell and Rick Thornburg, FPA's Director of Government Relations. According to Mrs. Lively's testimony, while on a company trip in December 1987, in front of Mr. Braswell and a board member, Mr. Thornburg pulled her down on his lap in a limousine and said that he wanted to look down her cleavage. Also in 1987, Mr. Braswell had Marjina Kaplan, FPA's Director of Marketing and Communications, hire a male stripper for Mrs. Lively's birthday, an event that Mrs. Lively testified was humiliating to her. Mrs. Lively acknowledged that she and others had previously hired a female dancer to dance with bare midriff at a party for Mr. Braswell. At a management meeting in July 1992, Mr. Thornburg suggested that a female staff member wear a miniskirt to a government conference to attract state legislators to FPA's booth. Also in 1992, Mr. Thornburg made an offensive comment about Mrs. Lively always being on her knees. At a meeting in October 1992, with nineteen or twenty FPA members present, Mr. Braswell jokingly suggested that Mrs. Lively was having sexual relations with a board member. Mrs. Lively testified that Mr. Braswell and Mr. Thornburg frequently referred to women as bimbos, hookers, old maids, and dykes, and made derogatory references to women's bodies.[1] In addition, three other female employees testified that they were subjected to sexually offensive comments on a regular basis by Mr. Braswell and Mr. Thornburg.

Mrs. Lively testified that on several occasions she complained to Mr. Braswell about the above-described incidents. She also testified that two other female employees complained to her regarding comments made about their bodies by Mr. Thornburg, and that she conveyed these complaints to Mr. Braswell. She testified that another female employee complained to her about comments made to her by Mr. Braswell, but said that she did not report that comment to anybody because "what was the sense of reporting it to anybody? Nothing was being done." Mrs. Lively's expert witness, Dr. Sandler, opined that FPA's sexual harassment policy failed to provide specific procedures for handling complaints and did not provide any route for corrective action except through Mr. Braswell.

There was also evidence of Mr. Braswell's retaliatory conduct toward those who complained of his sexually harassing behavior. In particular, Marjina Kaplan testified that she was the target of Mr. Braswell's retaliation in 1988. Ms. Kaplan testified that after she informed Mr. Braswell of complaints made by female employees of sexual harassment by Mr. Thornburg, Mr. Braswell responded with a series of abusive and hostile acts against her that culminated in an unfounded "below standard" performance evaluation that led her to resign. At the time of her resignation, she wrote a memorandum to each member of FPA's Board of Directors ("Board"), describing Mr. Braswell's ongoing harassment.

As a result of Ms. Kaplan's memorandum, the Board's Compensation and Personnel Committee entered into the minutes of its special meeting of January 1989 a warning to Mr. Braswell about his management style. The Committee chairman's contemporaneous statement to Mr. Braswell went so far as to call him a "chauvinist," having "a tendency to demean women and their abilities." It also upbraided him for using the terms "whores" and "hookers" at a staff meeting. Though the Committee issued the warning, it took no other corrective action. According to Mrs. Lively, following Mr. Bras-

---

1. None of the sexually offensive references or comments testified to by Mrs. Lively and her female coworker witness included the term "girl." That term came up only with reference to a comment Mr. Braswell was said to have made on Mrs. Lively's last day on the job when Mrs. Lively overheard Mr. Braswell tell another woman she was "the dumbest girl he had ever seen."

well's chastising by the Committee, he called a meeting of the staff directors. At this meeting, he accused Mrs. Lively of reporting his conduct to the Board, said that if she did she was a liar, and instructed the directors that they were not to complain to the Board.

In 1988, Mrs. Lively had received from Mr. Braswell her first unfavorable personnel evaluation, criticizing her written and oral communications. This was the third annual evaluation of her that he had performed.

Following this series of events, Mrs. Lively retained an attorney who wrote a letter to the Board in February 1989 complaining about Mr. Braswell's handling of the matter. Mrs. Lively testified that Mr. Braswell's negative attitude toward her became worse once he learned of the letter. The Board issued a letter to Mr. Braswell in August 1990, indicating that some senior members of the association were "unhappy" about what they considered unfair treatment of Mrs. Lively. The Board also sanctioned Mr. Braswell with an unusual restriction, preventing him from criticizing or disciplining Mrs. Lively. However, the Board, under a different chairman, lifted this restriction in 1992. In the meantime, Mrs. Lively was promoted to director of membership in late 1990.

In an incident unrelated to the alleged sexual harassment, Mrs. Lively injured her hip at work on November 18, 1991. She continued to work full-time until she underwent surgery a year later, in November 1992. After this surgery Mrs. Lively recuperated at home and then she worked in the office part-time in December.

On December 11, 1992, the last day that Mrs. Lively worked at the office, Mr. Braswell conducted a personnel evaluation of her. In the evaluation, Mr. Braswell advised Mrs. Lively that her communication skills were inadequate for her position

as Director of Membership. As a result, Mrs. Lively was placed on probation for six months, and was required to undergo testing at a center which primarily served learning disabled children. The testing at the center was made a condition of her continued employment. In addition, Mr. Braswell indicated that if Mrs. Lively's problems with communication skills did not improve after she went to the center it was likely that she would be demoted. The letter was signed by Mr. Braswell and Michael McNamara, then Chairman of FPA's Board.

Mrs. Lively refused to undergo the testing, but offered two alternative testing solutions. Mr. Braswell responded in writing that he had checked out both alternatives before choosing the center he had specified, that one was unsuitable because it was designed to serve non-high school graduates up to the ninth grade level, and that the other, the Anne Arundel Community College, had informed him that it lacked diagnostic services. He added, however, that he would be interested in pursuing the community college if in fact it could offer such testing. He stated that FPA still regarded diagnostic testing at his suggested center as the appropriate first step, but indicated a willingness to accept another equally competent diagnostic center.

Mrs. Lively worked part-time from her home from December 1992 through March 1993. She was paid her full salary by FPA until May 1993, when she was placed on temporary total disability. It was during this period that FPA found it necessary to hire Jerry West, a former chairman of the Board, to perform Mrs. Lively's duties on a temporary basis from his home in North Carolina.[2] Mrs. Lively's position was eventually filled by a person who worked full-time in the office.

On June 11, 1993, Mr. Braswell informed Mrs. Lively that she must return

---

**2.** The dissent does not fully describe Mr. West's qualifications when it refers to him as

simply "a male friend of Mr. Braswell."

to work with a full medical clearance on July 15, 1993, or be fired. Because Mrs. Lively was scheduled for surgery on July 8, 1993, she could not return to work and was terminated on July 15, 1993, seven months after her last appearance in the office. FPA explained that Mrs. Lively was terminated because of her inability to return to work in the office. [Tr. 6/17/96 p. 22]

Mrs. Lively filed suit against Mr. Braswell and FPA on December 8, 1993, five months after her termination. At the conclusion of the trial, the jury returned a verdict in favor of Mrs. Lively on all four counts, awarding: (1) $156,600 for discrimination due to a hostile work environment; (2) $155,135 for discrimination due to unequal pay; (3) $91,823 for unlawful retaliation; and (4) $54,600 for intentional infliction of emotional distress (IIED). The jury also awarded Mrs. Lively the lump sum of $535,658 in punitive damages for all four counts.

## II.

Following the verdict, appellees filed a motion seeking judgment as a matter of law or, in the alternative, a new trial. The trial judge granted judgment as a matter of law on the unequal pay and retaliation claims, concluding that those jury verdicts were based on insufficient evidence. In the alternative, the trial judge ordered a new trial as to those counts based on his view that the verdicts were clearly against the weight of the evidence. The court also granted judgment as a matter of law as to the hostile work environment and emotional distress claims, concluding that, although the evidence was sufficient to sustain the jury verdict, these claims were time-barred. In the alternative, the court granted a new trial on those counts, not because the verdicts were contrary to the weight of the evidence, but because the jury's punitive damages award was unitary, *i.e.,* a single lump sum based on all four counts, rather than apportioned among the various counts of the complaint.

## III.

■■ "In determining whether or not the trial judge properly granted judgment for the defendant notwithstanding the verdict, the record must be viewed in the light most favorable to the plaintiff." *Homan v. Goyal,* 711 A.2d 812, 817 (1998) (citing *Etheredge v. District of Columbia,* 635 A.2d 908, 915 (D.C.1993)). "The plaintiff is entitled to the benefit of every reasonable inference from the evidence." *Id.* (citations omitted). "Moreover, it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of the witnesses." *Id.* at 817–18 (citation omitted). "If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury." *Id.* (citing *Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc)).

### A. Unequal Pay

■■ In order to succeed on an unequal pay claim, the plaintiff must establish that the employer paid men and women unequally "for *equal work* on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Howard Univ. v. Best,* 484 A.2d 958, 984 (D.C.1984) (emphasis added). Mrs. Lively attempted to prove her claim by showing a disparity in pay between her position and those directorships held by men. The trial judge found, however, that Mrs. Lively's evidence was insufficient to enable a reasonable jury to find that these other director positions involved work equivalent to Mrs. Lively's director position. Specifically, the judge concluded that a comparison of the job descriptions of these various directorships revealed important differences in duties and required experience.

We agree that Mrs. Lively's evidence was insufficient to support a finding that she was performing substantially the

same work as the other directors. Comparing the job description of Mrs. Lively's membership directorship with those of the other five directorships (Business and Economic Research, Finance and Administration, Government Relations, Operations and Technology, and Public Relations and Marketing) reveals important differences in experience and duties. Mrs. Lively's directorship (1) supervised the fewest persons; (2) did not require a bachelor's degree; (3) had minimal responsibility outside the organization; (4) had the lowest skill requirements; and (5) required the least experience.

■ Mrs. Lively contends that the jury's verdict should stand because it reflects a determination that, although she was not entitled to pay equal to that of the other directors, she was still underpaid relative to her worth. Before trial, Mrs. Lively framed her pay claim broadly enough to support such a verdict: "[s]exually discriminatory administration of salary and other benefits of employment." At trial, however, she limited her claim to one for "unequal pay," both in her requested jury instructions and on the verdict form. As her claim went to the jury, therefore, it was one for equal pay, which could succeed only upon proof that she performed substantially the same work. *See, e.g., Gunther v. County of Washington,* 623 F.2d 1303, 1321 (9th Cir.) ("Where a Title VII plaintiff, claiming wage discrimination, attempts to establish a *prima facie* case based solely on a comparison of the work she performs, she will have to show that her job requirements are substantially equal, not comparable, to [those] of a similarly situated male."), *aff'd,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

Because appellant did not submit evidence tending to show that she performed substantially the same work as the other directors, the trial court properly granted judgment as a matter of law on this claim.

### B. Hostile Work Environment

Mrs. Lively contended that "she was subjected to discrimination in the course of employment by the defendants on the basis of gender by ... the creation and encouragement of a sexually hostile environment."

The trial court ruled that Mrs. Lively's hostile work environment claim was time-barred. Claims under the DCHRA must be filed "within one year of the unlawful discriminatory act, or the discovery thereof." D.C.Code § 1–2556(a) (1999 Repl.). Mrs. Lively filed her claim on December 8, 1993. In order to clear the bar of the statute of limitations, Mrs. Lively was required to show that the hostile work environment she experienced continued beyond December 8, 1992. Her last day in the office was December 11, 1992, and aside from events that occurred during her visit to the office on that day, there was no testimony of matters that may have contributed to the existence of a hostile work environment at her place of employment during the one-year limitations period. Mrs. Lively testified that on December 11 she overheard Mr. Braswell call another woman the "dumbest girl I've ever seen." [3] The trial court, citing *Galloway v. General Motors Serv. Parts,* 78 F.3d 1164 (7th Cir. 1996), ruled that the December 11 statement was insufficient to establish a sexually hostile work environment against Mrs. Lively. The trial court also rejected Mrs. Lively's argument that Mr. Braswell's per-

---

3. Considering the comment in its unredacted form, "you are the dumbest white girl I've ever seen," does not change the result. The comment, while obviously offensive racially, did not have a sexually offensive component that tended substantially to create a sexually hostile work environment.

Appellant also argues that appellees had a continuing policy of sexual discrimination

that maintained a hostile environment. Such a claim refers to "general policies or practices, such as hiring, promotion, training and compensation." *Provencher v. CVS Pharmacy, Div. of Melville Corp.,* 145 F.3d 5, 14 (1st Cir.1998). The record here does not support the claim that such general policies or practices existed.

formance evaluation of the same date and ensuing personnel actions brought her hostile environment claim within the statute of limitations. Appellant argues that the two matters just mentioned, the "dumbest girl" remark and the performance evaluation, carried a pre-existing sexually hostile work environment into the one-year period of limitations.

In order to review the trial judge's rulings, we must consider both the nature of a sexually hostile or abusive workplace and the doctrine of continuing violation. In deciding these issues, we will apply available District of Columbia precedents. In filling any interstices in our controlling precedents we may be aided by federal precedents arising from litigation under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*). *East v. Graphic Arts Indus. Joint Pension Trust,* 718 A.2d 153, 159 (D.C.1998) ("this court has often looked to cases construing Title VII ... to aid us in construing the [DCHRA]" because "the anti-discrimination provisions of both statutes are substantially similar") (quoting *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n. 17 (D.C.1993)). Because of differences in the statutes, however, such federal precedents do not necessarily dictate the result this court will reach. *Id.*

In reviewing this aspect of the case, we must also observe this court's opinion in *East, supra,* a case certified to this court by the United States Court of Appeals for the District of Columbia Circuit to consider an argument of equitable tolling of limitations in an employment discrimination case. There, we pointed out that statutes of limitations serve an important judicial function. *East, supra,* 718 A.2d at 161. We went on to state that "[i]t is particularly important that employment discrimination cases be brought promptly ... [as such claims] 'are apt to become stale quickly because the evidence necessary to support or refute such claims often consists of subjective estimations of the discriminatory climate at the work

place....'" *East, supra,* 718 A.2d at 161 (quoting *Davis v. Potomac Electric Power Co.,* 449 A.2d 278, 280 (D.C.1982)).

A sexually hostile environment arises when the workplace is permeated with sexual intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of victim's employment and create an abusive working environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Meritor Sav. Bank, F.S.B. v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

In order to extend the period of a hostile work environment, the allegedly harassing act within the statute of limitations need not be sufficient, standing alone, to comprise a claim. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1415 & n. 5 (10th Cir.1993). However, a plaintiff must show that the incidents both before and during the statutory period constitute a continuing course of conduct and are not discrete unrelated acts. *Id.*

> A continuing violation exists where there is a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period. To be considered continuing in nature, however, the discrimination may not be limited to isolated incidents, but must pervade a series or pattern of events which continue into the filing period.

*Doe v. District of Columbia Comm'n on Human Rights,* 624 A.2d 440, 444 n. 5 (D.C.1993) (citations omitted).

Under the principles relied on by most if not all of the federal circuits in evaluating claims of continued violations, the "dumbest girl" remark and the performance evaluation, along with the subsequent related exchanges preceding Mrs. Lively's termination, did not serve to bring Mrs. Lively's hostile environment claim within the one-year period of limitations.

A number of federal circuit and district courts have adopted the approach to continuing violation issues taken by the Fifth Circuit in *Berry v. Board of Supervisors,* 715 F.2d 971 (5th Cir.1983), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986). There, the Fifth Circuit set forth nonexclusive considerations for identifying the existence of a continuing violation, including: (1) whether the violations constitute the same type of discrimination; (2) the frequency of the violations; and (3) their permanence, *i.e.,* whether the nature of the earlier violations should have triggered the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *Berry, supra,* 715 F.2d at 981.[4]

■■■ The third, "permanency," factor in the *Berry* analysis is "perhaps of most importance." *Id.* The inquiry regarding this factor is whether the plaintiff was aware of, or at least suspected, dis-

4. The Third Circuit adopted the *Berry* approach in *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 756 (3d Cir.1995), a case in which all of the alleged incidents involved on-site workplace harassment and not management actions such as the performance evaluation in Mrs. Lively's case. In *Martin v. Nannie and the Newborns,* 3 F.3d 1410, 1414–16 (10th Cir.1993), the Tenth Circuit, applying the *Berry* test in a case in which all of the alleged incidents involved sexual harassment, reversed the grant of summary judgment for the defendants. Previously, that circuit had applied the *Berry* test in upholding a grant of summary judgment for defendant in a case which involved both hostile environment and retaliation. *Purrington v. University of Utah,* 996 F.2d 1025 (10th Cir.1993).

The First Circuit has adopted *Berry* but has tended to view the third factor, permanence, as dispositive without discussing the relatedness of the claimed incidents. *See, e.g., Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 53–54 (1st Cir.1999); *Sabree v. United Bhd. of Carpenters and Joiners, Local No. 33,* 921 F.2d 396, 402 (1st Cir.1990). Thus, a "continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place." *Provencher, supra,* 145 F.3d at 14; *see also Landrau–Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 612 (1st Cir.2000).

Similarly, the Seventh Circuit has said "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. University of Wis. Bd. of Regents,* 121 F.3d 1138, 1139 (7th Cir.1997) (citing *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167 (7th Cir.1996)); *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481–82 (3d Cir.1997); *cf. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 445–46 (7th Cir.1994) (awareness by plaintiff that discrimination was actionable will prevent tolling of limitations period).

The Sixth Circuit has adopted its own rule which incorporates the *Berry* factors. "In order to show that ostensibly discrete acts are a continuing violation, a plaintiff must be prepared to demonstrate (1) a policy of discrimination; (2) a continuing course of conduct, and (3) the present effects of past discrimination.... The second element requires that an employee challenge a series of allegedly discriminatory acts that are sufficiently related to constitute a pattern, at least one of which occurred within the limitation period." *Bell v. Chesapeake & Ohio Ry. Co.,* 929 F.2d 220, 223 (6th Cir.1991). The court considered the three *Berry* factors in evaluating the second element and concluded that the incidents were too sporadic to constitute a continuing course of conduct. *See id.* at 225. Moreover, the court held that plaintiff was or should have been aware of the discrimination at the time it occurred, particularly because he reported it to his superiors at that time. *See id.*

While the Fourth and Eleventh Circuits have not explicitly adopted the *Berry* test, courts in those circuits have recognized the test as a valid approach to continuing violation claims. *See Emmert v. Runyon,* 1999 WL 253632 at *4, 1999 U.S.App. LEXIS 8264 at *13 (4th Cir. Apr. 29, 1999); *Sloane v. Shalala,* 1998 WL 801499, at *2–*3, 1998 U.S.App. LEXIS 29460 at *7 (4th Cir. Nov. 19, 1998); *Scelta v. Delicatessen Support Servs.,* 89 F.Supp.2d 1311, 1322 (M.D.Fla.2000); *Blalock v. Dale County Bd. of Educ.,* 84 F.Supp.2d 1291, 1306 (M.D.Ala.1999). *Emmert* and *Carter v. West Publishing* have gone on to analyze the plaintiff's case under the third prong of *Berry*—whether the plaintiff knew, or should have known, of the violations at an earlier time, thus triggering the running of the limitations period. *Emmert, supra,* at *4–*5, 1999 U.S.App. LEXIS 8264 at *15–*17; *Carter v. West Publ. Co.,* 225 F.3d 1258, 1263–66 (11th Cir.2000).

crimination at the time of the earlier, time-barred incidents. *Compare Sabree v. United Brotherhood of Carpenters & Joiners, Local No. 33,* 921 F.2d 396, 402 (1st Cir.1990) (continuing violation theory not applicable where plaintiff "believed, at every turn, that he was being discriminated against") *with Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481–82 (3d Cir. 1997) (continuing violation theory applies where harassment intensified and plaintiff did not realize until later the severity of the harassment). In cases involving hostile work environment claims: "the plaintiff may not base her … suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in light of events that occurred later, within the period of the statute of limitations." *Galloway, supra* note 3, 78 F.3d at 1167; *see also Sabree, supra,* 921 F.2d at 402; *Rush, supra,* 113 F.3d at 481–82; *Speer v. Rand McNally & Co.,* 123 F.3d 658, 663–64 (7th Cir.1997) (no continuing violation where plaintiff was aware of the nature of the discriminatory acts as they occurred).

This court has applied this factor in the context of a "continuous tort" claim, stating "[O]nce the plaintiff has been placed on notice of an injury and the role of the defendant's wrongful conduct in causing it, the policy disfavoring stale claims makes application of the 'continuous tort' doctrine inappropriate." *Hendel v. World Plan Executive Council,* 705 A.2d 656, 667 (D.C. 1997) (citing *National R.R. Passenger Corp. v. Krouse,* 627 A.2d 489, 497–98 (D.C.1993), *cert. denied,* 513 U.S. 817, 115 S.Ct. 75, 130 L.Ed.2d 30 (1994); *Paul v. Howard Univ.,* 754 A.2d 297, 312 (D.C. 2000)).

Applying the permanency factor to the claims of Mrs. Lively, the record shows that appellant knew appellee's conduct between 1987 and 1992 was actionable. Mrs. Lively sought legal advice in early 1989 as a result of actions taken by Mr. Braswell against the staff in the wake of allegations by Marjina Kaplan that he had retaliated against her for complaining of sexual harassment. This also occurred after several alleged incidents involving Mrs. Lively occurred in 1987, one involving a remark about her "cleavage," the other the hiring of a male stripper, and Mrs. Lively's first negative personnel evaluation in 1988. On the basis of this record, it appears clear that by early 1989 Mrs. Lively knew, or should have known, that the earlier incidents were discriminatory. The continuing violation theory is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that her rights have been violated. *See, e.g., Martin v. Nannie & Newborns, Inc., supra* note 3, 3 F.3d at 1415 n. 6. Mrs. Lively had such awareness by 1989. Application of the *Berry* permanency factor strongly supports the conclusion that the statute of limitations began to run on Mrs. Lively's hostile environment claim involving activities in 1988 and 1989, at the latest, when she hired an attorney to deal with problems in early 1989.

 Turning to the requirement for similarity between incidents (the first *Berry* factor), we are persuaded that Mr. Braswell's performance evaluation of Mrs. Lively, communicated to her on December 11, was of an entirely different nature from the incidents of sexual harassment. We turn to a discussion of the *Berry* similarity factor now, and in doing so will consider how Mrs. Lively's claim would fare under the expansive approach taken by the Ninth Circuit, which has given that particular factor great weight.

The Ninth Circuit has rejected the three-factor *Berry* test, *see Fielder v. UAL Corp.,* 218 F.3d 973, 987 (9th Cir.2000).[5]

---

**5.** The Ninth Circuit stated in *Fielder* that it was not convinced that the Fifth Circuit's

In deciding a number of cases involving facts somewhat similar to those in this case, the court has used the first *Berry* factor (same type of discrimination) in determining whether the "alleged discriminatory acts are related closely enough to constitute a continuing violation." *Green v. Los Angeles County Superintendent,* 883 F.2d 1472, 1480–81 (9th Cir.1989) (quoting *Berry, supra,* 715 F.2d at 981).

In *Green,* the appellant's allegations involved time-barred incidents of sexual harassment by other employees as well as failure to train and relocat , along with timely allegations of subsequent discrimination relating to medical leave, medical benefits, poor references, and discharge. The court concluded that the time-barred incidents "represent a separate form of alleged employment discrimination," *id.* at 1481, from the more recent acts complained of, and thus were not within the statute.

In *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104 (9th Cir.1998), the Ninth Circuit cited Supreme Court precedent for the requirement that the court engage in "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.* at 1109 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)). In *Draper,* immediately after plaintiff accused her supervisor of persisting in his sexually harassing treatment, he responded by telephoning his supervisor in plaintiff's presence and telling him that plaintiff was in his office "digging up old bones, and accusing him of sexually harassing her." Her supervisor then began to laugh in a

manner that plaintiff perceived as derisive and mocking. In this context, no leap was required to make a connection between this later treatment of the plaintiff and the earlier, time-barred incidents, and to view it as an extension of the same type of behavior. By contrast, the record here provides no direct connection between the manner in which Mrs. Lively's performance evaluation was conducted and the earlier incidents of harassment against her. The inference that these incidents are related is simply the same inference a jury may make when evaluating a claim of retaliation.[6] If this court were to consider the possibly retaliatory act by Mr. Braswell as an extension of the hostile work environment, the definition of hostile work environment would be broadened to include many acts that are properly challenged as retaliatory.

The Ninth Circuit's recent decision in *Fielder, supra,* shows that that court still follows *Green.* In *Fielder,* the appellant alleged that she had been subjected to a series of related discriminatory and retaliatory acts which extended into the limitations period. The court stated that "[b]ecause the legal elements of the various Title VII violations-hostile work environment and retaliation-are different, 'we consider the allegations with respect to each theory separately,* in determining whether any of the events underlying these claims occurred with the relevant period of limitations.'" *Fielder, supra,* 218 F.3d at 984 (quoting *Draper, supra,* 147 F.3d at 1108) (emphasis added). "Every incident of discrimination before the limitations period need not be of the same type, so long as there is a corresponding type of discrimi-

*Berry* analysis was properly suited for the hostile work environment and retaliation claims before it. *Berry* involved Title VII and Equal Pay Act claims that Berry was paid less than male colleagues for equal work, a Title VII claim for work load discrimination, and a 42 U.S.C. § 1983 claim based on similar complaints. Prior to the decision in *Fielder,* however, the Fifth Circuit had applied its *Berry* rationale to a hostile work environment claim in *Waltman v. International Paper Co.,* 875

F.2d 468 (5th Cir.1989) and other circuits had done likewise. *See, e.g., Purrington v. University of Utah,* 996 F.2d 1025, 1028 (10th Cir. 1993); *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481–82 (3d Cir.1997); *Bell v. Chesapeake & Ohio Ry. Co.,* 929 F.2d 220, 225 (6th Cir.1991).

6. See Part D for discussion of Mrs. Lively's retaliation claim.

nation within the period." *Id.* at 986. The court considered and compared the alleged acts within the period and before the period in concluding that summary judgment was inappropriate because there was a material issue of fact as to whether there was a continuing violation.

In its recent decision in *Van Steenburgh v. Rival Co.*, 171 F.3d 1155 (8th Cir.1999), the Eighth Circuit did not adopt the *Berry* analysis in a case in which the factors involving continued violation closely resembled those in the Ninth Circuit's decision in *Draper, supra.* Instead, the Eight Circuit followed the Ninth Circuit approach of placing reliance on relatedness as opposed to the several *Berry* factors. In *Van Steenburgh,* the alleged harassment consisted of repeated sexual advances, touching, offensive comments, and threats of retaliation, with months often passing between incidents. *Van Steenburgh, supra,* 171 F.3d at 1157–58. The only incident within the limitations period occurred when plaintiff's supervisor, the harassing individual, in front of his own supervisor and numerous coworkers of plaintiff, advised plaintiff in a manner the circuit described as hostile that he was placing another worker above her in the plant's hierarchy. *Id.* at 1158. The court noted that the jury could have found the supervisor's actions to be discriminatory because he would not have treated a male employee in the same way in which he treated plaintiff. The link between the most recent act and the previous sexually offensive acts was the offensive manner in which the supervisor treated the female employee. In the present case, in contrast, there was no showing that the manner in which Mr. Braswell conducted his performance evaluation of Mrs. Lively was untoward or different from the manner in which he conducted such meetings with male employees.[7]

There are many other federal circuit opinions applying the *Berry* requirement of same type of discrimination. In *Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir.1989), for example, the plaintiff's co-workers engaged in a continuing course of hostile behavior involving sexual grabbing as well as hostile and sexually explicit comments both within and outside the statutory period. The court stated: "Waltman's claim undisputedly meets the first *Berry* element that the alleged acts involve the same subject matter; every incident reported by Waltman involves sexual harassment." 875 F.2d at 475. Another example of "same subject matter" is *Glass v. Petro–Tex Chem. Corp.*, 757 F.2d 1554, 1561 n. 5 (5th Cir.1985). There, the plaintiff charged her employer with discriminatory failure to promote, stemming from three employment decisions made over a five-year period, only the last of which occurred within the statutory period. In *Glass,* the court described the shared subject matter of the discriminatory acts narrowly as "promotion to payroll manager." *Id.*[8]

7. Contrary to the suggestion of the dissent, Dissent at p. 974, our application of the *Van Steenburgh* approach does not posit that only an act of a sexual nature may support a hostile environment claim.

8. Other circuits have adopted a requirement of a showing of a series of related acts in order to come within the continuing violation theory, but have neither adopted nor rejected the *Berry* analysis. The D.C. Circuit, for example, requires that, in order to recover based on a theory of continuing violation, "a plaintiff must prove either a 'series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period.' " *Palmer v. Kelly,* 17 F.3d 1490, 1495 (D.C.Cir.1994) (quoting *Berger v. Iron Workers Reinforced Rodmen Local 201,* 269 U.S.App. D.C. 67, 843 F.2d 1395, 1422 (D.C.Cir.1988)). The Second Circuit has stated "a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994) (citation omitted).

In the instant case, the outcome is the same whether we apply the Fifth Circuit's three-factor *Berry* test or the Ninth Circuit's more permissive *Draper* approach.[9] Addressing first the December 11 incident, in which Mr. Braswell commented to another employee that she was "the dumbest girl I've ever seen," we note that it was an isolated incident which was unlike the other incidents which served as the basis for Mrs. Lively's hostile work environment claim.

The fact that the comment was not directed at Mrs. Lively and was not sexual, while not entirely conclusive, detracted considerably from any tendency to create a hostile environment and also demonstrates that the comment was dissimilar from previous incidents. It was neither substantial enough nor similar enough to those incidents to trigger the continuing violation doctrine. *See Galloway, supra,* 78 F.3d at 1167 (finding co-worker's reference to appellant as "sick bitch" not discriminatory because it was "in context, not a sex-or gender-related term"). The use of the term girl itself is not sexually hostile. *See Paragon Cable Manhattan* (labor arbitration), 100 LA 905, 908–909 (1992) ("using the word 'girl' to address a woman may not be politically correct, but it does not rise, or more accurately sink, to the level of sexual harassment"); *see also Gearhart*

*v. Sears, Roebuck & Co.,* 27 F.Supp.2d 1263 (D.Kan.1998) (summary judgment granted in hostile work environment case where male supervisor referred to plaintiff and female co-workers as "the girls" and female co-worker showed plaintiff faxes with sexual connotations), *aff'd,* 194 F.3d 1320 (10th Cir.1999) (reported in full text format at 1999 WL 781056, 1999 U.S.App. LEXIS 24359). Mr. Braswell's words on December 11, 1992 did not, therefore, rise to a level that constituted a "violation during the limitation period that can serve as the anchor for the earlier conduct." *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 446 (7th Cir.1994) (citing *Purrington v. University of Utah,* 996 F.2d 1025, 1028 (10th Cir.1993)).

Similarly, Mr. Braswell's performance evaluation of Mrs. Lively, communicated to her on December 11, was of an entirely different nature from the incidents of sexual harassment, noted above, as was his eventual termination of her employment.

Applying the requirement that we consider the allegations with respect to each theory separately to Mrs. Lively's performance evaluation, one cannot characterize the performance evaluation or its follow-up as "sexual or gender-based harassment"; it is, however, readily characterized as retaliation.[10] The record does not show any reference to sexual harassment or any

9. In light of our holding in *Doe, supra,* 624 A.2d at 444 n. 5 that, to be continuing in nature, the conduct must consist of a series of related acts and pervade a series or pattern of events, and our holding in *Hendel, supra,* 705 A.2d at 667 of the effect of a plaintiff's having been put on notice of an injury upon a claim of continuing violation, the *Berry* approach is more consistent with the law of this jurisdiction.

10. The elements of a *prima facie* case of hostile environment harassment have been stated as:

(1) the basis: membership in a protected group;
(2) the activity: unwelcome conduct of a sexual [sex-based] nature;
(3) the issue: affecting a term and condition of employment;

(4) the causal connection: on the basis of sex; and
(5) employer responsibility.
1 Lindemann & Kadue, Sexual Harassment in Employment Law 168–169 (1992) (citing *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982)).
A claim of retaliation under Title VII requires the showing of the following:
(1) that the complainant engaged in statutorily protected participation in Title VII processes or opposition to discriminatory employment practices;
(2) an adverse employment action such as a discharge;
(3) a causal connection between the protected activity and the adverse employment action; and
(4) that adverse action was taken against a covered person by a covered respondent.
Lindemann & Kadue, *supra,* at 275.

laughter or offensive comments, as in *Draper*, that would transform Mr. Braswell's evaluation into an incident that is harassing on its face or one in which the offender treated the appellant in a manner in which he would not have treated a male employee, as in *Van Steenburgh*. Moreover, the evaluation was a specific incident of alleged discrimination that was different in character from Mrs. Lively's other allegations of persistent discriminatory conduct, save for a limited similarity to a performance evaluation four years earlier. Accordingly, we conclude that the performance evaluation and the exchange of letters that followed it did not serve to trigger the continuing violation theory and thus permit Mrs. Lively to base her hostile environment claim on occurrences that took place before the one-year limitation period.[11]

### C. Intentional Infliction of Emotional Distress

Generally, an action for intentional infliction of emotional distress is governed by the residuary three-year limitation of D.C.Code § 12–301(8) only if it is "not intertwined with any of the causes of action for which a period of limitation is specifically provided." *Saunders v. Nemati*, 580 A.2d 660, 665 (D.C.1990). To the extent that Mrs. Lively's emotional distress claim is based on Mr. Braswell's sexually discriminatory conduct, it is "intertwined with" her hostile work environment claim and thus it assumes the hostile work environment claim's one-year limitation period. Mrs. Lively's emotional distress claim, therefore, is restricted to incidents that occurred within the year preceding the filing of her complaint, *i.e.*, her performance evaluation, discontinuance of her worker's compensation benefits, and her termination.

"To establish the required degree of 'outrageousness,' the plaintiff must allege conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C.1997) (citations omitted). In the employment context, we have been demanding in the proof required to support a claim for intentional infliction of emotional distress. *Id.* For example, in *Kerrigan*, the plaintiff alleged that the defendant had "targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position." *Id.* We held that those allegations, even if true, were of the type attributable to "employer-employee conflicts [that] do not, as a matter of law, rise to the level of outrageous conduct." *Id.* (quoting *Howard Univ. v. Best, supra*, 484 A.2d at 986). Because appellant's claim is limited to the events after December 8, 1992, conduct that was certainly no more outrageous than that alleged in *Kerrigan*, it fails as a matter of law.

We therefore affirm the trial court's grant of judgment notwithstanding the verdict as to appellant's claim for intentional infliction of emotional distress.

### D. Retaliation

In order to succeed in her gender-based retaliation claim, Mrs. Lively had to prove by a preponderance of the evidence that FPA's stated reason for terminating her—*i.e.*, that Mrs. Lively needed to resume full-time employment—was a pretext for the actual reason—*i.e.*, that Mrs. Lively

11. We disagree with the dissent's statement that "the jury concluded that there was a continuing violation." Dissent at p. 975. Neither the verdict form nor the instructions placed that question before the jury. Rather the judge noted after trial that there was no continuing violation as a matter of law.

was fired in retaliation for the sexual harassment complaints she made to the Board and Mr. Braswell. The trial court ruled that no reasonable juror could have concluded that FPA's reason was a pretext, because Mrs. Lively herself testified that she could not return to work for health reasons, not because of sexual harassment.

■ Mrs. Lively also argues that the trial court should have considered events other than her termination in evaluating retaliation. For example, she asserts that Mr. Braswell retaliated against her with verbal abuse, unfair salary decisions, and unwarranted criticisms in personnel evaluations. Although Mrs. Lively attempted at trial to broaden her retaliation claim to include these events, her counsel did not object to the court's final jury instructions, which limited the claim to retaliatory termination. She therefore has not preserved those issues for appeal.

■ "To make out a prima facie case of retaliation, the plaintiff must establish: (1) she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two." *Knight v. Georgetown Univ.*, 725 A.2d 472, 478 (D.C. 1999). Once the prima facie case has been established, "a rebuttable presumption arises that [Mr. Braswell's] conduct amounted to unlawful discrimination." *Arthur Young v. Sutherland*, 631 A.2d 354, 361 (D.C.1993). Mr. Braswell can rebut this presumption "by articulating some legitimate, nondiscriminatory reason for the employment action at issue." *Id.* (citations omitted) (internal quotations omitted). "[O]nce the employer offers a nondiscriminatory reason, it becomes [Mrs. Lively's] burden to demonstrate by a preponderance of the evidence that the reason is pretextual." *Knight, supra*, 725 A.2d at 478. By addressing the insufficiency of Mrs. Lively's proof that FPA's stated reasons for terminating her were pretextual,

the trial judge implicitly indicated that she had established a prima facie case of retaliation, and we will assume, *arguendo*, that she did.

In reviewing the trial court's grant of judgment as a matter of law, we must reverse if, having given Mrs. Lively the benefit of every reasonable inference, we conclude that a reasonable jury could have found sufficient Mrs. Lively's evidence of retaliation. *See Homan v. Goyal*, 711 A.2d 812, 817 (D.C.1998). Mrs. Lively would rely on the following evidence that appellees' reason for terminating her was a pretext: (1) Mr. Braswell and Mr. Thornburg had sexually harassed Mrs. Lively in the past; (2) Mr. Braswell had taken extreme measures to prevent any complaints of sexual harassment from coming to the attention of the Board; and (3) the person who was engaged to perform Mrs. Lively's duties during her period of whole or partial incapacitation before her termination, and who carried out those duties until a full-time person assumed Mrs. Lively's duties at FPA's headquarters, worked part-time from his home in North Carolina for one year.

Mrs. Lively had surgery on her hip in November 1992. In December, she returned to work on a "modified work schedule," working shorter days to avoid rush hour. She testified that she worked every second day in December until December 11, the day of her annual evaluation with Mr. Braswell, and that from then until March she worked from home making telephone calls to members because it was membership renewal time. Doctor's notes were admitted into evidence indicating that she could not work in November, that she could do only "light duty" from December 2 to December 16, and that from then until April 6 she was unable to go to work. Significantly, Mrs. Lively acknowledged that her own doctor's notes showed that starting on April 8, 1993, she was "totally incapacitated for work."

Mrs. Lively testified that she spoke to Mr. Braswell on one occasion between December and March and that she also spoke to Jane Dandelski, an administrative assistant. Mr. Braswell testified that he was not aware that Mrs. Lively was working at home "nor did we instruct her to work at home. I am not aware that she worked any of 1993 either at the office or at home." Mr. Braswell also testified that management did not discuss offering her temporary employment working at home, and that she had not requested such accommodation. He was receiving "constant reports from medical sources indicating that she was unable to return to work," and some staff members had visited her and reported back that she was unable to return to work and was not going to be able to return to work. In early 1993 FPA found it necessary to engage former Board Chairman Jerry West to assume Mrs. Lively's job "on a temporary part-time basis." Appellant's position was ultimately filled by someone who worked full-time in the office.

On June 11, a full six months after Mrs. Lively's last day in the office, defendants sent plaintiff a letter saying that if she could not return to work by July 15 she would be terminated. Ms. Lively testified that her attorney responded with a letter asking for additional time, which was not granted. The record shows, however, that the letter from Mrs. Lively's attorney did not request additional time, although it stated that return on July 15 was not possible. In July she went on long-term disability. She testified that she believed she could have continued to do the job as she had been doing from home and coming in part-time, because "90 percent of my recruitment and retention was done by telephone, and that's what I was doing at home."

█ It is clear that Mrs. Lively was not able to come in to work between December 11, 1992 and July 15, 1993. Although the record would support a finding that Mrs. Lively worked part-time at home until March, 1992, she did not do any work after that time, and her doctor's notes showed that she was "totally incapacitated for work." The record is devoid of any evidence that Mrs. Lively discussed alternative work arrangements with Mr. Braswell during this period. Giving Mrs. Lively the benefit of every inference, a reasonable juror could not conclude that FPA's stated reasons for terminating Mrs. Lively's employment were pretextual. It is certainly true that the events preceding Mrs. Lively's absence from the office—Mr. Braswell's action toward, and in the presence of, of Mrs. Lively, the showing of prior acts of retaliation, Mr. Braswell's attempts to squelch further complaints, and the performance evaluation in which Mrs. Lively was placed on probation and threatened with demotion—all shed light on Mr. Braswell's state of mind, and suggest that her incapacitation may have been convenient for him. Nonetheless, the evidence is clear that she was unable to work for over three months before her employment was terminated. Because no reasonable juror could conclude, by a preponderance of the evidence, that FPA's explanation—that Mrs. Lively was unable to come to work—was pretextual, we affirm the trial court's grant of judgment as a matter of law on this claim.

### E. Punitive Damages

The jury awarded $535,658 in punitive damages after returning verdicts in appellant's favor on all of her claims. Because we affirm the trial court's grant of judgment as a matter of law on all of appellant's claims, we also affirm the trial court's ruling setting aside the jury's award of punitive damages.

*Affirmed.*

REID, Associate Judge, concurring in part and dissenting in part:

I agree with the majority's analysis of Ms. Lively's unequal pay claim. However, I am unable to agree with my colleagues with regard to their review of Ms. Lively's

hostile environment, retaliation and intentional infliction of emotional distress claims, and the jury's award of punitive damages. Therefore, I respectfully dissent as to these issues.

In this case the jury examined and weighed extensive evidence, made credibility determinations, and drew legitimate and reasonable inferences from the evidence presented before concluding that Ms. Lively prevailed on her claims of hostile work environment, unequal pay, unlawful retaliation, and intentional infliction of emotional distress. Despite the evidence presented by Ms. Lively, and the jury's conclusion, the trial court granted the appellees' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

I begin by emphasizing our standard of review. "Generally, a motion for judgment after trial and verdict is granted only in 'extreme' cases." *United Mine Workers of Am., Int'l Union v. Moore,* 717 A.2d 332, 337 (D.C.1998) (quoting *Daka, Inc. v. Breiner,* 711 A.2d 86, 96 (D.C.1998)) (internal quotations and other citation omitted). Moreover, "[t]he evidence must be viewed in the light most favorable to the plaintiff, who is entitled to every legitimate inference therefrom." *Etheredge v. District of Columbia,* 635 A.2d 908, 915 (D.C.1993) (citations omitted). In that regard, "it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of the witnesses." *Id.* at 916 (citations omitted). "If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury." *Id.* (citing

*Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc)). Thus, " '[a] judgment notwithstanding the verdict should be granted only when the evidence, viewed in the light most favorable to the nonmoving party, permits only one reasonable conclusion as to the proper judgment.' " *Levy v. Schnabel Found. Co.,* 584 A.2d 1251, 1254 (D.C.1991) (quoting *Lewis v. Washington Metro. Area Transit Auth.,* 463 A.2d 666, 669 (D.C.1983)). In addition, "[t]o grant a motion for a new trial, the trial court must find that the verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand." *United Mine Workers, supra,* 717 A.2d at 337 (citation omitted). *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).[1]

On the record before us, I am constrained to conclude that the trial judge and my colleagues failed to review the evidence in the light most favorable to Ms. Lively, and to recognize not only that she was entitled to every legitimate and reasonable inference, but also that it is the task of the jurors, rather than the judges, to weigh the evidence and determine the credibility of the witnesses. Hence, in my view, the trial court erred in granting the appellees motion for judgment notwithstanding the verdict, and, in the alternative, abused its discretion by granting appellees a new trial in the event that this court reversed its judgment vacating the jury's verdict.

---

1. In *Reeves, supra,* the Supreme Court stated:
 [I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.
 In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. (Citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." (Citation omitted). Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. (Citation omitted). That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 2110.

### The Hostile Work Environment Claim

My colleagues agree with the trial court that Ms. Lively's hostile environment claim was time-barred, essentially because:

> The December 11 incident, in which Mr. Braswell commented to another employee that she was 'the dumbest girl I've ever seen,' was an isolated incident which was unlike the other incidents which the trial court believed had produced a hostile work environment.... Additionally, Mr. Braswell's performance evaluation of Ms. Lively, communicated to her on December 11, was of an entirely different nature from the incidents of sexual harassment, as was his termination of her employment.

I believe that these conclusions by the majority reflect a misunderstanding of what constitutes a continuing violation with regard to a hostile work environment, and the evidence required to prove its existence. The interrelationship between a hostile environment claim and a continuing violation was examined in *Van Steenburgh v. Rival Co.*, 171 F.3d 1155 (8th Cir.1999), a sexual harassment/hostile environment case in which the 8th Circuit reversed the district court's grant of judgment as a matter of law after the jury had rendered a verdict in favor of the plaintiff. In that case, the court stated:

> Unlike quid pro quo harassment or other "discrete" forms of sex discrimination, hostile environment harassment is an "ongoing nightmare for the employee victim, in legal parlance, a 'continuing violation.' " *Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 229 (8th Cir.1996). An incident within the limitations period need not satisfy the definition of sexual harassment under Title VII when viewed in isolation. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir.1998); *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 499–500 (8th Cir. 1998). Rather, the jury must be capable of perceiving the incident as "discriminatory" in light of all the prior incidents of sexual harassment. *See Hathaway v.*

*Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1997) (reinstating jury verdict for plaintiff because humiliating and intimidating effect of snickering noises could have been seen as stemming from prior rejection of sexual overtures); *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992) (directing the trier of fact to focus on the cumulative effect of the harassment rather than "carv[ing] the work environment into a series of discrete incidents").

*Id.* at 1159. The jury in Ms. Lively's case obviously perceived Mr. Braswell's comments and actions on December 11, 1992, and his July 15, 1993 termination of her, as discriminatory in light of all the other incidents of sexual harassment about which Ms. Lively, Ms. Kaplan, Ms. Logsdon, and Ms. Gness testified at trial.

In light of the jury's verdict, a review of Ms. Lively's employment history at FPA, as well as the environment in which she worked, is essential to our analysis. Ms. Lively commenced her career at FPA in 1980, and soon rose to increasingly higher levels of responsibility. Approximately six years after she was hired, Mr. Braswell began his tenure as President of FPA and became Ms. Lively's supervisor. After Mr. Braswell fired the female Director of Government Relations in 1987, and replaced her with his friend, Mr. Thornburg, the two men began to make regular, even daily, discriminatory and offensive comments to or about women, using such words as bimbos, broads, hookers, prostitutes, old maids, dykes and girls, and uttering language or gestures referring to female body parts, including breasts. In December 1987, while Ms. Lively, Mr. Thornburg, and Mr. Braswell were on business travel, Mr. Thornburg "pulled [Ms. Lively] down on his lap [as she was getting into a limousine] and said, 'Sit here, Lively. I want to look down your cleavage.' "

Ms. Kaplan, Director of Marketing and Communications from 1987–88 recounted the abuse and hostility to which she was

subjected after she complained about sexual harassment incidents which she observed in the office. When Mr. Braswell prepared a performance evaluation for Ms. Kaplan in 1988, he described her as a "disruptive force," in part because of her complaints about sexual harassment. He also stated that her "communications" skills were inadequate. As in Ms. Lively's case, this was the first time anyone at FPA had criticized Ms. Kaplan's communications skills. In response to Ms. Kaplan's complaint after she left FPA, FPA's Board of Directors conducted an investigation through its Compensation and Personnel Subcommittee. The chairman of the Board, who also served as the chairperson of FPA's Board, prepared a January 9, 1989 statement addressed to Mr. Braswell, indicating, in part:

> You appear to have a tendency to demean women and their abilities, at the same time advancing and promoting the career of [Mr.] Thornburg. While I do not want to debate the sexual overtones (harassment?) attributed to [Mr. Thornburg], I feel the charges were true and your handling of the situation with a "trial" is a ludicrous management style.

Despite this statement from the Board chairperson, Mr. Braswell's salary was increased in January 1989, and a new automobile was made available to him. In addition, Mr. Braswell forbade FPA employees from taking complaints to the Board about him. Subsequently, after Ms. Lively complained about Mr. Braswell's abusive treatment, the FPA eventually prohibited him from making critical comments about Ms. Lively, or disciplining her. The prohibition extended from 1990 to about December 1992.

In July 1992, during a budget planning session, Ms. Lively heard Mr. Thornburg discuss how FPA would attract people to its booth at a state government affairs conference. Mr. Thornburg said: "to get state legislators into the FPA booth, [FPA] would just put [a female employee] out in the aisle in a short skirt, and that would bring the state legislators into the booth so that FPA could talk to them." On October 1, 1992, Mr. Braswell made a comment at a meeting, in the presence of nineteen to twenty people, which implied that a male staff member was in Ms. Lively's room at night for sexual reasons. On December 11, 1992, Mr. Braswell stated that another female employee was "the dumbest girl I've ever seen."

That same day, December 11, 1992, just as he had in Ms. Kaplan's case, Mr. Braswell informed Ms. Lively that he had completed his personnel evaluation of her. He criticized Ms. Lively's communications skills. Even though Ms. Lively had been employed at FPA since 1980, and had assumed increasingly responsible positions, the record shows no criticism, prior to December 11, 1992, of Ms. Lively's communications skills by anyone other than Mr. Braswell, who made a negative comment in 1988, the very same year in which he also criticized Ms. Kaplan's communications skills. Not only did Mr. Braswell criticize Ms. Lively's communications skills, but he also placed her on six months probation pending improvement in her communications skills, and ordered her to appear for diagnostic testing at the Kingsbury Center, a facility specializing overwhelmingly (90 to 95% of its business) in learning disabilities or brain dysfunctions of children.

A jury could reasonably infer from this record that the December 1992 incidents— Mr. Braswell's comment that a female employee of FPA was "the dumbest girl I've ever seen," and his order that Ms. Lively submit to diagnostic testing at a facility specializing in learning disabilities and brain dysfunctions of children, both of which occurred at the office after a period during which Ms. Lively had worked at home due to recuperation from hip surgery, constituted a continuation of Mr. Braswell's discriminatory behavior towards Ms. Lively, and thus, were not isolated or unrelated events. *See Van Steenburgh, supra.*

The majority determines that *Van Steenburgh, supra,* is inapplicable to Ms. Lively's case because "there was no showing in this case that the manner in which Mr. Braswell conducted his performance evaluation of Ms. Lively was untoward or different from the manner in which he conducted such meetings with male employees." In reaching this conclusion, I respectfully believe that the majority misinterprets *Van Steenburgh,* and, in the context of our standard of review, the record before us. Furthermore, the majority fails to recognize that harassment of a non-sexual nature may support a hostile environment claim. *See Van Steenburgh, supra; see also Spain v. Gallegos,* 26 F.3d 439, 447 (3d Cir.1994) (hostile environment claim may be based on actions which "are not sexual by their very nature").

The female plaintiff in *Van Steenburgh* began her employment with the Rival Company, a manufacturing plant, in 1988. Beginning in late 1989 or early 1990, the employee's immediate supervisor made unwanted comments and advances of a sexual nature to and against the employee. These advances or unwanted physical contacts continued in 1992 and 1994, despite the employee's complaints. On June 8, 1995, the employee's supervisor "decided to place another employee above her on the production line." *Id.* at 1158. The trial court "held that there was insufficient evidence at trial for the jury to find either that sexual harassment occurred within the limitations period or that ... [Van] Steenburgh was constructively discharged." *Id.* The 8th Circuit reversed, stating, in part:

> Rival is mistaken in asserting that there must be incidents within the limitations period that are explicitly sexual. *See Nichols v. American Nat'l Ins. Co.,* 154 F.3d 875, 887 (8th Cir.1998) (holding that all evidence of abusiveness is relevant to the pattern of discrimination in a continuing violation claim); *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993) (finding shouting, derogatory remarks, and non-sexual physical contact sufficient to establish a claim for hostile environment sexual harassment). "The critical inquiry is 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Hathaway, [supra ],* 132 F.3d at 1222 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)[ ] (Ginsburg, J., concurring)). If [the supervisor's] conduct toward [the employee] on June 8, viewed in the context of his prior harassment, would not have been directed toward a male employee, the jury's finding of hostile environment harassment should be affirmed.

*Id.* at 1159.

Through her testimony and that of her colleagues, Ms. Lively established a "continuing policy and practice of discrimination on a company-wide basis" and that "[the] policy and practice operated at least in part within the limitation period...." *Green v. Los Angeles Cty. Superintendent of Sch.,* 883 F.2d 1472, 1480 (9th Cir.1989). Both Mr. Braswell and Mr. Thornburg engaged in a practice of sexual harassment through language, gestures, and actions on a regular or daily basis beginning around 1987. Mr. Braswell steadfastly refused to discipline his friend, Mr. Thornburg, or heed the January 9, 1989 words of the Board chairperson that he "appear[ed] to have a tendency to demean women and their abilities, at the same time advancing and promoting the career of [Mr.] Thornburg." The January 9, 1989 statement was given to him after he demeaned the communications skills of Ms. Kaplan when she complained about the sexual harassment by Mr. Braswell and Mr. Thornburg. A few years later, in December 1992, just after the Board lifted the two year prohibition on discriminatory comments or actions by Mr. Braswell against Ms. Lively, he not only resumed his sexually harassing comments by referring to a female employee as, "the dumbest girl I've ever seen," but

also prepared a performance report for Ms. Lively in which he demeaned her communications skills and directed her to be tested at a facility specializing in learning disabilities and brain dysfunctions of children. In addition, Mr. Braswell rejected Ms. Lively's request to be tested at a facility, such as the Anne Arundel Community College, which did not specialize in children's problems. Mr. Braswell acknowledged at trial that no male employee had been subjected to the same directive as Ms. Lively. Mr. Braswell testified that Ms. Lively was fired because she did not return to full time employment at the office. However, the record shows that Ms. Lively was replaced by a male friend of Mr. Braswell's who carried out his duties for one year on a part time basis from his home in North Carolina.

The relationship between Mr. Braswell's sexually harassing comments and his personnel actions regarding Ms. Kaplan and Ms. Lively could easily and legitimately be inferred by reasonable jurors. "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1014 (8th Cir.1988). Furthermore, " '[e]vidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment.' " *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 355 (8th Cir.1997) (quoting *Gillming v. Simmons Indus.*, 91 F.3d 1168, 1172 (8th Cir.1996)); *see also Fielder v. UAL Corp.*, 218 F.3d 973 (9th Cir.2000) (where a female airline employee had been subjected to sexual harassment for a sustained period of time and complained about it, her act of escorting her mother onto an airplane, for which she received a public reprimand, and "the denial of her transfer request [to another jurisdiction] were closely related enough to constitute a continuing violation").

Based on the record before us and particularly in light of the standard of review which guides our decision, I am unable to conclude that "only one reasonable conclusion [may be reached] as to the proper judgment," *Levy, supra*, 584 A.2d at 1254 (citation omitted), and that is that appellees should prevail. To the contrary, when viewed in the light most favorable to Ms. Lively, there is ample evidence to support a continuing violation. Moreover, the existence of a continuing violation is mainly a factual determination. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir.1998). The jury concluded that there was a continuing violation, and I see no basis for disturbing that conclusion.

### The Retaliation, and Intentional Infliction of Emotional Distress Claims

I address the remainder of the majority's opinion briefly. I disagree with the conclusion that no reasonable jury, based on the record before us, could find Ms. Lively's evidence sufficient to establish retaliation. "Under the DCHRA it is an unlawful discriminatory practice for an employer to retaliate against a person on account of that person's opposition to any practice made unlawful by the DCHRA." *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.1994) (footnote omitted) (referencing *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C.1993)). Ms. Lively had complained about the sexual harassment of Mr. Braswell and Mr. Thornburgh on more than one occasion. As soon as the two-year prohibition on Mr. Braswell's criticism or attacks on Ms. Lively was lifted by FPA's Board chairperson, Mr. Braswell issued a performance evaluation critical of her communications skills, and directed her to submit to diagnostic testing at a facility specializing in learning and brain problems of children. In addition, knowing that she had been working part-time from her home while she was recuperating from hip surgery and faced another operation in July 1993,[2] he nonethe-

2. At the end of October 1992, Ms. Lively had

hip surgery as a result of a November 1991

less issued an ultimatum in June 1993 that she return to work full-time or be terminated. Furthermore, FPA refused to pay Ms. Lively the usual severance benefits. All of this "conduct [had] the capacity of being considered retaliatory, [and thus, the question of retaliation] bec[a]me an issue for the fact finder," the jury. *Fielder, supra,* 218 F.3d at 986. The jury found Ms. Lively's evidence sufficient to show retaliation, and, in my view, there was no basis on which to disturb that finding.

The trial court apparently vacated the jury's award on Ms. Lively's intentional infliction of emotional distress claim because, "without the hostile work environment claim, plaintiff's emotional distress claim is restricted to incidents involving her performance evaluation, discontinuance of worker's compensation benefits, and eventual termination in July, 1993, over seven months after she last appeared at the FPA office." As I indicated earlier in this dissent, in my view, Ms. Lively presented sufficient evidence to establish her hostile work environment claim in a timely manner. She also summarized the devastating impact that appellees' prolonged and repeated practice of sexual harassment, culminating in the personnel actions against her, including the directive to submit to testing at a facility specializing in children's learning disabilities and brain dysfunctions, had on her thirteen year career at FPA:

> I felt that I had lost everything, except my family, because FPA was my life. I had been there for 13 years when they fired me, and I was just totally devastated. I couldn't eat. I couldn't sleep. I felt paranoid. I closed the blinds. I didn't want my neighbors to see me for I was so afraid that they would think that I did have a communication problem. So the only people I surrounded myself with for about three or four months was immediate family, and I never want to experience that kind of feeling again. I

accident at the office (she collided into a desk during office renovation), and worked part-time at home during all of November and part

was totally depressed. I don't ever want to go through that again.

So devastating were appellees' actions that Ms. Lively had to seek psychiatric counseling. Under our decisions in *King v. Kidd,* 640 A.2d 656 (D.C.1993); *Estate of Underwood v. National Credit Union Admin.,* 665 A.2d 621 (D.C.1995), Ms. Lively presented evidence sufficient for a reasonable jury to conclude that she sustained her claim for intentional infliction of emotional distress. Similarly, although this is a closer call for me, given my review of the record before us, I cannot say that the evidence was insufficient to support the jury's award of punitive damages, even though I agree with the reversal of Ms. Lively's unequal pay claim. Therefore, I would remand this issue to the trial court for further consideration.

In sum, I would affirm the trial court's judgment as to Ms. Lively's unequal pay claim, but reverse its judgment granting judgment as a matter of law, or in the alternative a new trial, with respect to Ms. Lively's hostile work environment, retaliation and intentional infliction of emotional distress claims, and would remand the issue of punitive damages to the trial court for further consideration, except with respect to the unequal pay claim.

of December 1992. However, she was in the office on December 11, 1992.